PALADIN ASSOCIATES, INC., a Montana corporation, and Marie G. Owens, doing business as Paladin Associates, a Montana Sole Proprietorship, Plaintiffs,

v.

MONTANA POWER COMPANY, a Montana corporation, North American Resources Company, a Montana corporation, Northridge Petroleum Marketing, Inc., a Canadian corporation, and TransCanada Gas Services Limited, a Canadian corporation, f/k/a Northridge Gas Marketing Inc., a Canadian corporation, Defendants.

No. CV–95–067–BU.

United States District Court, D. Montana, Butte Division.

May 4, 2000.

Frank C. Crowley, Michael J. Uda, Doney, Crowley, & Bloomquist, PC, Helena, Richard L. Fanyo, Dufford & Brown, PC, Thomas P. McMahon, Powers Phillips, PC, Denver, CO, for Paladin Associates, Inc., Marie G. Owens.

Robert T. O'Leary, Montana Power Company—Legal Department, Butte, Nicholas A. Verwolf, Steven F. Greenwald, Alan S. Middleton, Cassandra L. Kinkead, Davis, Wright & Tremaine, Bellevue, WA, Todd L. Lundy, Baker & Hostetler, Denver, CO, David J. Ivey, Baker & Hostetler, Houston, TX, Timothy R. Beyer, Brownstein Hyatt Farber, Denver, CO, Arthur G. Matteucci, Matteucci, Falcon, Squires & Lester, Great Falls, Munir R. Meghjee, Baker & Hostetler, Denver, CO, William A. Squires, Attorney at Law, Helena, Peter J. Korneffel, Jr., Brownstein Hyatt

Farber, Denver, CO, for Montana Power Company, North American Resources Company, Northridge Petroleum Marketing, Inc., TransCanada Gas Services Limited.

## MEMORANDUM AND ORDER

HATFIELD, Senior Judge.

The plaintiffs, Paladin Associates, Inc. ("PAI") and Marie G. Owens ("Owens"), instituted the present action alleging the defendants, Montana Power Company ("MPC"), North American Resources Company ("NARCO"), Northridge Petroleum Marketing, Inc. ("Northridge Petroleum") and TransCanada Gas Services Limited ("TransCanada") engaged in certain anti-competitive activities with respect to the intrastate transportation and sale of natural gas in Montana, and the interstate transportation of natural gas through Montana for sale to customers located south of Montana. Invoking the original jurisdiction of this court under 28 U.S.C. § 1337, plaintiffs advance five claims for relief under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. Plaintiffs also advance five claims for relief predicated upon state common law, urging the court to assert supplemental jurisdiction over these claims. Plaintiffs seek compensatory damages, punitive damages, treble damages and injunctive relief based upon the referenced claims.

Presently before the court are the following motions: (1) defendants' motions for summary judgment; (2) defendants' motions urging the court to exclude the expert testimony of Robert Franz, C. Leslie Webber, Jack Harpole and David Huettner; (3) defendants MPC and NARCO's motion to strike portions of the affidavits of Richard Swinney and Marie Owens; (4) defendants' motions for costs and attorney's fees incurred with respect to the supplemental depositions of Robert Franz and C. Leslie Webber; and (5) defendants Northridge Petroleum and TransCanada's joint motion for costs and attorney's fees incurred in responding to plaintiffs' coun-

ter-motion to strike and limit certain defense experts. Having reviewed the record herein, together with the parties' briefs in support of their respective positions, the court is prepared to rule.

## BACKGROUND

### A. Parties

Defendant MPC is a public utility that operates, among other things, a natural gas gathering, transmission, storage, and distribution system in Montana ("MPC's system"). MPC's system extends generally from the Montana–Canada border on the north to the Wyoming border on the south.

Plaintiff PAI is a Montana corporation that, at times pertinent to this action, marketed natural gas within Montana to industrial customers connected to MPC's system, and outside of Montana to customers downstream of MPC's system. PAI obtained its natural gas supplies primarily from Canadian gas suppliers and gas producers located in Montana. PAI entered into contracts with MPC for the transportation of natural gas through MPC's system. PAI is owned by its president and sole shareholder, plaintiff Owens, and operated by Owens and her husband, Richard Swinney ("Swinney").

Plaintiff Paladin Associates ("PA") is a natural gas consulting business operated as a sole proprietorship by Owens.

Defendant NARCO is a natural gas marketer and wholly-owned subsidiary of Entech, Inc. ("Entech"), which in turn is a wholly-owned subsidiary of MPC. NARCO markets natural gas in Montana and elsewhere.

Defendant Northridge Petroleum is a Canadian corporation. Northridge Petroleum marketed natural gas in Montana until July of 1992, when it sold all of its assets to Northridge Gas Marketing, Inc. ("Northridge Gas"), a Canadian corporation. In July of 1995, Northridge Gas changed its name to TransCanada Gas Services Limited. Defendant TransCana-

da is a Canadian corporation that engages in natural gas marketing activities in Montana and elsewhere. For purposes of this Memorandum and Order, Northridge Petroleum, Northridge Gas, and TransCanada shall be referred to individually and collectively as "Northridge."

### B. Sources of Gas Delivered to MPC's System

Gas enters MPC's system from a number of sources. Gas produced and gathered in Montana is connected directly to MPC's system or delivered to MPC's system via the Northern Natural Gas pipeline located in northcentral Montana.

Gas produced in Canada is delivered directly into MPC's system via a pipeline operated by the NOVA Corporation of Alberta, Canada ("NOVA"). The NOVA pipeline connects with MPC's pipeline at an interconnect located at Carway, Alberta, referred to as the "NOVA Interconnect," and at an interconnect located at Aden, Alberta.[1]

### C. Transportation and Distribution of Natural Gas

MPC transports and distributes natural gas intrastate to "on-system" customers,[2] and transports natural gas interstate across Montana for delivery to "off-system"[3] markets located south of Montana. The gas transported interstate across MPC's pipeline is delivered into two pipelines that interconnect with MPC's system near Montana's southern border. The Williston Basin Interstate ("WBI") pipeline connects to MPC's system at the WBI Interconnect at Warren, Montana. The WBI pipeline transports gas for distribution in eastern Montana, North Dakota and South Dakota. The Colorado Interstate Gas Company ("CIG") pipeline con-

nects to MPC's system at the CIG interconnect at Grizzly, Montana. The CIG pipeline extends in a southeasterly direction to Texas and the Oklahoma Panhandle, and connects with other pipelines that serve markets in California.

### D. State and Federal Regulation of MPC's System

MPC's operation of its gas transmission and storage facilities is regulated by both the Montana Public Service Commission ("MPSC") and the Federal Energy Regulatory Commission ("FERC"). Title 69, Chapter 3 of the Montana Code Annotated empowers the MPSC to regulate MPC's natural gas rates and operations in Montana. The Natural Gas Act, 15 U.S.C. §§ 717 et seq., grants to the FERC comprehensive regulatory authority over MPC's interstate transportation of natural gas.

### E. Introduction of Unbundled Natural Gas Service

Prior to 1991, natural gas customers in the United States were generally required to purchase natural gas from a local distribution company on a "bundled" basis. The single "bundled" price paid by customers encompassed all the costs for delivering the gas to the customer, including payments made by the local distribution company to upstream pipelines, producers, and processing plants, and expenses incurred by the local distribution company in operating its own transportation, distribution and storage facilities.

In 1991, the FERC ordered pipelines regulated by the FERC to offer natural gas services on an "unbundled" basis. Accordingly, pipelines were required to separately offer, at individual prices,

---

1. At Carway, the NOVA pipeline actually connects with a pipeline owned by Canadian–Montana Pipeline Company ("CMPL"), a wholly-owned subsidiary of MPC. The CMPL pipeline travels a short distance and connects with the MPC pipeline.

2. An "on-system" customer is a natural gas customer located in Montana that receives gas from MPC's system.

3. The term "off-system" means downstream of MPC's system.

transportation, storage and other natural gas services which they previously had offered on a bundled, single-price basis. Additionally, the FERC required pipelines to separate the merchant function of selling gas from the common carrier function of transporting gas. These changes at the federal level led states to follow suit with respect to the intrastate transportation and sale of natural gas regulated by state agencies.

The "unbundling" arrangements had significant impacts on natural gas customers and marketers. After natural gas service was unbundled, large natural gas customers could purchase natural gas as a commodity from an unregulated seller at market price, and then contract with a pipeline and/or local distribution company for firm or interruptible transportation of that gas to the customer's location at a regulated rate.[4] Similarly, natural gas marketers could acquire natural gas at sources remote from the customers location, arrange for transportation and accompanying services relating to the delivery of the natural gas, and then sell a "rebundled" package of services to the natural gas customer.

### F. Unbundled Natural Gas Service in Montana

On November 1, 1991, MPC began providing unbundled intrastate transportation service and unbundled interstate transportation service. The intrastate transportation service approved by the MPSC established two classes of on-system customers—"core" customers and "non-core" customers. Generally, core customers consisted of residential and small business customers. Core customers were not eligible for unbundled transportation service and had to continue to purchase gas on a fully-bundled basis. Non-core customers were customers, primarily industrial, whose annual consumption of gas exceeded 60 million cubic feet ("60,000 Mcf"). Non-core customers were eligible to begin receiving unbundled transportation service from MPC beginning on November 1, 1991.[5]

The interstate transportation service offered by MPC in 1991 included Interruptible Transportation service and Premium Interruptible Transportation service. In 1992 and 1993, MPC began offering Off-Peak Transportation service and Interruptible Storage service.

### G. Anticompetitive Conduct Alleged by Plaintiffs

Plaintiffs allege MPC, NARCO and Northridge individually, and/or collectively, engaged in eight acts of anticompetitive conduct relating to MPC's offering of interstate and intrastate natural gas transportation and storage services. These acts of anticompetitive conduct alleged by plaintiffs may be summarized as follows:

### 1. Coverage of Gas Shortages and NOVA Assignments

In the months prior to the unbundling of natural gas service, gas suppliers, including Northridge and PAI, undertook efforts to market gas to on-system, non-core customers who had previously purchased gas solely on a bundled basis. As of Novem-

---

**4.** Firm natural gas transportation service is transportation service that is not subject to intentional curtailment or interruption. To the contrary, interruptible transportation service is subject to intentional interruption.

**5.** Pursuant to the plan approved by the MPSC, unbundled transportation service was phased in over three years. During the first shortened year, from November 1, 1991, through August 31, 1992, on-system, non-core customers could choose to take all of their natural gas requirements through a fully-bun-

dled Sales Subscription Service or convert one-third of their annual consumption of natural gas to unbundled transportation service. During the second year, from September 1, 1992, through August 31, 1993, on-system, non-core customers could convert two-thirds of their annual requirements to unbundled transportation service. During the third year, from September 1, 1993, through September 1, 1994, on-system, non-core customers could convert their entire consumption of natural gas to unbundled transportation service.

ber 1, 1991, twelve on-system, non-core customers elected to purchase natural gas from suppliers other than MPC: (1) ASARCO; (2) Ash Grove Cement Co.; (3) Columbia Falls Aluminum Co.; (4) Cyprus/Luzenac; (5) State of Montana;[6] (6) Barretts Minerals (aka Pfizer/Barretts); (7) Rhone–Poulenc; (8) Stone Container; (9) Louisiana–Pacific; (10) Montana Resources; (11) Plum Creek; and (12) Great Falls Gas Co. The gas purchased by these on-system, non-core customers during gas year 1991–1992, was provided by a variety of gas suppliers including: PAI, Northridge, Transenergy, Rainbow Gas, North Canadian Marketing, Unigas, GGSI, Le-Roy, Tiber, Shell Canada, Adobe, Aloe and Gateway. PAI provided gas to one on-system, non-core customer—Ash Grove Cement Co. Northridge provided some or all of the gas required by six on-system, non-core customers: ASARCO, Columbia Falls Aluminum Co., Barretts Minerals, Rhone–Poulenc, Louisiana Pacific and Plum Creek.

A large portion of the gas supplied by PAI and Northridge was produced in Canada, transported across the NOVA pipeline and delivered into MPC's system at the NOVA Interconnect at Carway. In gas year 1991–1992, all of the gas transported on the NOVA pipeline to Carway was transported on an interruptible basis. Firm transportation service was not available at that time. On November 1, 1991, the first day of unbundled transportation service, NOVA interrupted the delivery of gas to Carway. This interruption lasted approximately 36 hours. Other brief interruptions in the delivery of natural gas

to Carway occurred in 1992. The interruptions caused some on-system customers to experience gas shortages.

### a. Coverage of Gas Shortages

From November 1, 1991, through November 1, 1992, MPC covered the gas shortages incurred by the on-system, non-core customers with excess gas MPC had in storage as a consequence of the unbundling process.[7] As soon as the NOVA interruption was resolved, the customer replaced the gas advanced by MPC. MPC covered the gas shortages caused by the NOVA interruptions because MPC had the ability to do so without risk to its core customers, unbundled transportation was new, the non-core customers were not at fault, interruption in the supply of gas to the non-core customers could cause serious consequences for those customers, and the transportation revenue earned by continuing deliveries of gas to the non-core customers helped offset rates paid by MPC's core customers. The coverage of the gas shortages also meant the on-system, non-core customers were not charged a balancing penalty for withdrawing more gas from MPC's system than was injected into the system.[8]

### b. Assignment of NOVA Firm Transportation Service

On November 1, 1991, MPC executed a 15–year contract with NOVA for 30 million cubic feet per day ("30,000 Mcf/d") of firm transportation service on NOVA's pipeline. In June of 1992, MPC gave notice to the on-system, non-core customers that it was

---

6. Beginning in 1991, the State of Montana purchased gas on an unbundled basis for six of its facilities: the Montana State Hospital, Montana State Prison, Montana Developmental Center, Northern Montana College, Montana State University and University of Montana.

7. In their briefs, the parties refer to gas provided to the on-system customers by MPC, during NOVA interruptions, as "imbalance coverage."

8. Section 15.2 of MPC's 1991 intrastate GTC–1 tariff establishes two distinct balancing penalties. First, if a customer's injections into, and withdrawals from, MPC's system differ by more than 4% in any particular month, the customer is subject to a "balancing rate" (penalty) on the imbalance over 4%. Second, if a customer's imbalance is greater than 10% in any particular month, the customer is subject to a more onerous "balancing penalty rate."

selling 5–year assignments of the firm transportation service, commencing on November 1, 1992. The assignments were attractive to the on-system customers because they could purchase Canadian gas from any marketer or producer and have the gas delivered to MPC's system at Carway on a firm basis. MPC offered the assignments to the on-system, non-core customers in two distinct formats: the customer could acquire a 5–year assignment subject to fourteen days of interruption, or in the alternative, the customer could pay MPC an up-front demand charge of $20 per Mcf and receive an unconditional 5–year assignment of NOVA firm transportation service. By November 1, 1992, six of the twelve on-system, non-core customers had contracted with MPC for an assignment of MPC's firm transportation service on NOVA's pipeline. The assignees were (1) ASARCO; (2) Columbia Falls Aluminum Co.; (3) Rhone–Poulenc; (4) Pfizer/Barretts; (5) Louisiana Pacific; and (6) Plum Creek.

Plaintiffs contend MPC coerced the six on-system, non-core customers to acquire assignments of firm transportation service, by threatening to discontinue its practice of covering gas shortages caused by interruptions on NOVA's pipeline.

### 2. PAI's Acquisition of Firm Transportation Service on NOVA's Pipeline

On or about August 1, 1991, PAI submitted an application to NOVA for firm transportation service on NOVA's pipeline. Before executing a contract with NOVA, PAI asked MPC whether it intended to purchase firm transportation service on NOVA's pipeline and assign the same to on-system, non-core customers. In response, MPC allegedly informed PAI that it had no duty to obtain firm transportation service for on-system customers or

educate them on the availability of the firm transportation service. Operating under a belief that MPC had no intention of purchasing firm transportation service on NOVA's pipeline, PAI entered into a 15–year contract for NOVA firm transportation service in the amount of 30,000 Mcf/d. After executing the contract, PAI learned that MPC had also acquired 30,000 Mcf/d of firm transportation service on NOVA's pipeline.

Plaintiffs contend MPC induced PAI to contract with NOVA for firm transportation capacity by leading PAI to believe it had no intention of purchasing firm transportation service on NOVA's pipeline.

### 3. MPC's Open Season for the 1991–1992 PIT Contract

In July of 1991, MPC conducted an "open season" (i.e., an auction) where interested parties could submit bids on a one-year contract for 10,000 Mcf/d of off-system transportation service on MPC's pipeline, to commence on November 1, 1991. This service, known as Premium Interruptible Transportation ("PIT") service, provided firm interstate transportation service across MPC's system, except for fourteen days per year when the service was interruptible. The holder of the PIT contract was required to pay a commodity charge for the gas actually transported on the MPC pipeline, but was not required to pay a demand charge.[9]

In its June 25, 1991, notice to potential bidders, MPC advised that the winning PIT bidder would have to demonstrate the ability to carry gas away from MPC's system, via the CIG pipeline or the WBI pipeline, under conditions comparable to the PIT service requested from MPC. In that regard, MPC advised that construction of an interconnect linking the MPC pipeline to the CIG was to begin in the fall of 1991.[10]

---

**9.** A demand charge is a reservation charge which must be paid by a shipper even if the transportation service is not used.

**10.** Construction of the CIG Interconnect began in September of 1991, and the CIG Interconnect was entered into service on December 1, 1991. The WBI Interconnect, which

MPC received eighteen bids for PIT service ranging from $.02 to $ .20 per Mcf. NARCO's bid was $.09 per Mcf. Neither PAI nor PA participated in the open season. MPC afforded each of the bidders higher than NARCO an opportunity to demonstrate the required downstream transportation capacity. Ultimately, each of the bidders higher than NARCO either elected not to pursue the downstream capacity or was unable to arrive at terms with CIG or WBI for the required downstream transportation capacity. NARCO was selected as the successful bidder for the PIT contract in September of 1991. NARCO demonstrated the required downstream capacity by obtaining a contract with CIG, on August 30, 1991, for firm transportation service on CIG's pipeline with a receipt point at Grizzly. Under its contract with CIG, NARCO agreed to acquire 15,000 Mcf/d of firm transportation service on CIG's pipeline for the first year, and 10,000 Mcf/d thereafter for a 15–year term.

Plaintiffs contend NARCO won the PIT contract because MPC provided NARCO with advance notice of the bidding requirement compelling bidders to acquire downstream capacity on the CIG or WBI pipelines under terms comparable to the PIT service offered by MPC.

### 4. *PAI's Requests for Interruptible Transportation Service Across MPC's System From the NOVA Interconnect to the Grizzly Interconnect*

On November 1, 1991, MPC began offering month-by-month Interruptible Transportation ("IT") service on its pipeline. In contrast to PIT service, a shipper holding IT rights was not assured firm space on MPC's pipeline. The IT shipper had only "standby" transportation rights that were subordinate to the rights of MPC's core customers and the rights of the PIT shippers. In accordance with FERC tariffs, MPC allocated available IT capacity to

shippers according to the price they bid in monthly IT auctions. PAI submitted bids for monthly IT service for the months of September, October and November 1992. Plaintiffs contend MPC improperly rejected these bids based upon priorities that MPC alone had established.

### 5. *PAI's Request for Firm Transportation Service on MPC's System*

On or about December 31, 1991, NOVA advised PAI that the NOVA firm transportation service it had previously contracted for beginning November 1, 1993, could be accelerated to January 15, 1992. Desirous of obtaining interstate firm transportation service on MPC's system that would match the firm transportation service available on NOVA's pipeline, PAI submitted a request to MPC, on January 28, 1992, for 20,460 Mcf/d of firm transportation service across MPC's system from the NOVA Interconnect to the CIG Interconnect, for a term of fifteen years, commencing on November 1, 1992. MPC rejected PAI's request, stating that no tariff filed with the FERC authorized MPC to provide the firm transportation service requested by PAI.

Plaintiffs contend that firm off-system transportation on MPC's system had been approved by the FERC in 1990, and that MPC's failure to provide PAI with the requested firm transportation service precluded PAI from taking advantage of business opportunities presented by the accelerated firm transportation service available on the NOVA pipeline.

### 6. *PA's Bid on the OPT Contract*

On May 14, 1992, MPC gave notice to interstate gas shippers of its intention to conduct an open season for 10,000 Mcf/d of Off–Peak Transportation ("OPT") service. The OPT service provided firm interstate transportation service on MPC's system for a period of five years commencing November 1, 1992, subject to MPC's right to interrupt service up to fourteen days per

linked the MPC pipeline to the WBI pipeline,

had been in service since 1990.

year. The OPT service was similar to PIT service with the exception the OPT contract obligated the shipper to pay a monthly demand charge in addition to the commodity charge, and the OPT contract covered a period of five years, rather than the one-year term under the PIT contract. The OPT open season was held from August 31, 1992, to September 9, 1992. PA submitted the highest bid for OPT service and was awarded the OPT contract on October 30, 1992. PAI was not a party to the OPT contract.

Plaintiffs contend that once PAI was induced by MPC to acquire firm transportation service on the NOVA pipeline, PA was compelled to win the OPT contract because PAI could not meet its financial obligations to NOVA unless it had access to firm transportation service on MPC's system.

### 7. *State of Montana Bid*

With the advent of unbundled natural gas service on November 1, 1991, six State of Montana facilities qualified as "non-core" customers—*i.e.*, Montana State Hospital, Montana State Prison, Montana Development Center, Northern Montana College, Montana State University and University of Montana. In 1991, the State of Montana began purchasing gas for these facilities through a central purchasing manager by competitive bid on an annual basis. To qualify as a bidder for the state contract, the bidder had to meet the reliability of supply standards imposed by the state.

For the first short year of unbundled transportation service, from November 1, 1991, to July 31, 1992, Rainbow Gas was awarded the contract to supply natural gas to the six state facilities. PAI was the successful bidder for the contract covering the period from August 1, 1992, through July 31, 1993. NARCO was the successful bidder for the contract covering the period from August 1, 1993, to July 31, 1994. NARCO was able to meet the reliability of supply standards by obtaining a commit-ment from MPC for a one-year assignment of NOVA firm transportation capacity, that was contingent upon NARCO winning the bid for the contract.

Plaintiffs contend the conditional assignment offered to NARCO was not offered to other bidders, thereby affording NARCO an unfair competitive advantage in the bidding process.

### 8. *MPC's Allocation of Priorities for IS Service*

On July 1, 1993, MPC began offering interstate Interruptible Storage ("IS") services at its Dry Creek Storage field located at the southern end of its system near the CIG Interconnect. The IS service allowed off-system shippers to, among other things, purchase natural gas during off-peak periods when sale prices were low, have the natural gas injected into storage, and then withdraw the natural gas from storage for delivery to off-system markets through the CIG Interconnect during peak periods when sale prices were high, or at times when upstream gas supplies were curtailed or interrupted.

IS service was provided by MPC from excess storage capacity MPC had at its Dry Creek Storage Field. The use of the Dry Creek Storage Field for IS Service was subordinate to the use of the storage field for intrastate transportation service, intrastate storage, OPT service and IT service. The priority system for injections and withdrawals of natural gas established with respect to IS service, which were approved by the FERC, provided that the storage injections and withdrawals for each month were to be allocated in accordance with the transportation rate bids of the shippers with IS service contracts, from highest to lowest.

Plaintiffs contend MPC manipulated the allocation priorities for the IS Service in a manner that provided the bids of the IT shippers higher priorities than the bids of the OPT shippers, thereby rendering PAI's OPT contract worthless. Plaintiffs

further contend MPC designed the IS Service in a manner that minimized NARCO's costs and provided NARCO with an unfair competitive advantage in the off-system gas market downstream of the Grizzly Interconnect.

### H. *PAI Terminated its Contract With NOVA*

In November of 1994, PAI terminated its 15–year contract with NOVA for firm transportation service on NOVA's pipeline. Plaintiffs contend the termination was caused by the above-described activities of the defendants. PAI has not possessed firm transportation service on the NOVA pipeline since November of 1994.

### I. *Present Action*

Plaintiffs instituted the present action on October 30, 1995. The Amended Complaint asserts ten claims for relief. Counts one through five of the Amended Complaint allege violations of federal antitrust laws.

Count 1—alleges MPC, acting in concert with CMPL, engaged in a product tying arrangement to compel on-system, non-core customers to purchase assignments of NOVA firm transportation service held by MPC, in violation of section 1 of the Sherman Act.

Count 2—alleges MPC conspired with Northridge to boycott PAI in violation of section 1 of the Sherman Act.

Count 3—alleges MPC and NARCO monopolized access over MPC's pipeline to the Grizzly Interconnect with respect to the sale of natural gas to off-system customers located downstream of MPC's system, in violation of section 2 of the Sherman Act.

Count 4—alleges MPC and NARCO attempted to monopolize access over MPC's pipeline to the Grizzly Interconnect with respect to the sale of natural gas to off-system customers located downstream of MPC's system, in violation of section 2 of the Sherman Act.

Count 5—alleges MPC conspired with Northridge to monopolize the market for the sale of natural gas to on-system, non-core customers, in violation of section 2 of the Sherman Act.

Counts 6 through 10 of the Amended Complaint assert state law claims against MPC for (1) breach of contract (count 6); (2) breach of the implied covenant of good faith and fair dealing (count 7); (3) tortious interference with contractual or business relations (count 8); (4) intentional interference with a prospective business advantage (count 9); and (5) negligence (count 10), based upon activities pertaining to the MPC's transportation and storage of natural gas.[11]

The defendants advance numerous challenges in opposition to the claims asserted by plaintiffs. First, defendants MPC and NARCO argue that all of the claims asserted against them are barred by the filed rate doctrine and the state action doctrine. Second, defendants MPC and NARCO ar-

---

11. In counts 6 and 7, plaintiffs allege MPC breached its OPT contract with PA, and breached the implied covenant of good faith and fair dealing, by introducing IS service under terms and conditions that frustrated the purpose of the OPT contract and rendered it worthless.

In counts 8 and 9, plaintiffs allege MPC intentionally caused damage to PAI's contractual and/or business relationship with NOVA for firm transportation service on NOVA's pipeline by: 1) providing imbalance coverage to on-system, non-core customers; 2) refusing to sell PAI firm transportation service on MPC's system in January of 1992; and 3) introduc-

ing IS service in a manner that rendered PAI's contract with NOVA worthless.

In count 10, plaintiffs allege that MPC, as a utility with monopoly power over the transportation of gas on its system, owed PAI a duty of full disclosure which MPC breached by: 1) failing to inform PAI in August of 1991 that it had applied for firm transportation service on NOVA's pipeline; 2) failing to inform PAI in 1991 of its intention to provide imbalance coverage to on-system customers when the gas flow on NOVA's pipeline was interrupted; and 3) failing to inform PAI of its intention to introduce IS service in 1993.

gue that the antitrust claims asserted by plaintiff Marie Owens d/b/a Paladin Associates ("PA") should be dismissed because PA lacks standing to assert such claims. Third, defendants challenge all of the claims, on an individual basis, arguing the claims fail on the merits as a matter of law. Fourth, defendants MPC and NARCO argue that to the extent the antitrust claims are premised upon MPC's award of the PIT contract to NARCO on September 11, 1991, and NARCO's acquisition of firm transportation service on the CIG pipeline on August 30, 1991 (*i.e.*, acts occurring more than four years prior to the commencement of this action), the claims are barred by the four-year statute of limitations prescribed in section 4B of the Clayton Act, 15 U.S.C. § 15b. Fifth, defendant Northridge argues that the antitrust claims asserted against it should be dismissed because plaintiffs cannot prove any antitrust damages.

## DISCUSSION

### A. *The Filed Rate Doctrine*

MPC and NARCO contend all of the claims asserted by plaintiffs based upon MPC's provision of interstate transportation and storage services are barred by the filed rate doctrine.[12]

■ Two principles lie at the core of the filed rate doctrine. *See, AT & T v. Central Office Telephone, Inc.*, 524 U.S. 214, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998)

First, the filed rate doctrine prevents regulated entities from discriminating against certain ratepayers by requiring that the rates charged ratepayers, and the services provided for those rates, be consistent (the nondiscrimination strand).[13] Second, the filed rate doctrine preserves the exclusive role of the federal agencies in establishing reasonable rates by precluding federal district courts from adjudicating what a reasonable rate might be in a collateral lawsuit (the nonjusticiability strand). *See, Montana–Dakota Utils. Co. v. Northwestern Pub. Serv. Co.*, 341 U.S. 246, 250, 71 S.Ct. 692, 95 L.Ed. 912 (1951).[14] The nonjusticiability strand bars any claim filed against a regulated utility that implicates the exclusive rate-approval role of a federal agency. *AT & T v. Central Office Telephone*, 524 U.S. 214, 223, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998). The causes of action that are barred by the filed rate doctrine generally fall into one of three categories: (1) actions by a rate payer seeking to avoid payment of a filed rate on the ground the rate payer was quoted a lower rate by a regulated entity, *see e.g., Maislin Industries U.S. v. Primary Steel, Inc.*, 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990); (2) actions by a rate payer alleging that a regulated entity failed to deliver services it promised in addition to those prescribed in a tariff,[15] *see e.g. Central Office, supra*, 524 U.S. at 214, 118 S.Ct. 1956; and (3) actions by a

---

12. The claims based upon interstate transportation and storage services are set forth in counts 3, 4, 6, 7, 8, 9 and 10 of the Amended Complaint.

13. The nondiscrimination strand recognizes that if the terms of a tariff published by the FERC are not rigidly enforced, agents of utilities might intentionally misquote rates to favored customers, while other customers whose business is less important would be compelled to pay the higher published rate. *See, Maislin Industries, U.S. v. Primary Steel, Inc.*, 497 U.S. 116, 128, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990).

14. The nonjusticiability strand recognizes that legislatively appointed regulatory bodies have institutional competence to address rate-making issues, that courts lack the competence to

set rates, and that the interference of courts in the rate-making process would subvert the authority of the rate-setting bodies and undermine the regulatory regime. *Sun City Taxpayers' Ass'n v. Citizens Utilities Co.*, 45 F.3d 58, 62 (2d Cir.1995).

15. The preclusive effect of the filed rate doctrine is not limited to claims challenging "rates *per se* ". *Central Office*, 524 U.S. at 223, 118 S.Ct. 1956. Because rates do not exist in isolation, the filed rate doctrine also operates to bar claims challenging the services, privileges, provisions, etc. provided in exchange for a filed rate. *Id.* Any claim for excessive rates can be couched as a claim for inadequate services and vice versa. *Id.*

rate payer alleging the filed rate was unreasonable because it was the product of an antitrust violation or some other alleged wrongdoing, *see e.g., Square D Company v. Niagara Frontier Tariff Bureau*, 476 U.S. 409, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986).

■ In the present case, the antitrust claims asserted by plaintiffs based upon the provision of interstate transportation and storage services are not barred by the filed rate doctrine because they do not challenge a filed rate as being unreasonable, they do not seek services or privileges in addition to those set forth in an applicable tariff, and they are not premised upon the denial of services or privileges guaranteed by an applicable tariff. Instead, the claims assert that MPC and NARCO monopolized, and/or attempted to monopolize the sale of gas to off-system customers located downstream of the Grizzly Interconnect, by denying PAI access to an essential facility consisting of MPC's pipeline from the NOVA Interconnect to the Grizzly Interconnect and MPC's storage facilities at the Dry Creek Storage Field. In short, the antitrust claims do not implicate the rate-approval role of the FERC.[16]

### B. *The State Action Doctrine*

MPC contends the claims asserted by plaintiffs based upon MPC's provision of intrastate transportation and storage services should be dismissed under the state action doctrine, because the MPSC regulates the intrastate transportation and storage of natural gas through the issuance of applicable tariffs.

■ The state action doctrine is an affirmative defense that offers antitrust immunity for anticompetitive conduct in certain instances in which a state, as a matter of state policy, has displaced competition with regulation. *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980); *Columbia Steel Casting Co. v. Portland Gen. Elec. Co.*, 103 F.3d 1446, 1455 (9th Cir.1996). The immunity extends not only to state agencies, but also to private individuals and corporations. *See, Southern Motor Carriers Rate Conference, Inc. v. U.S.*, 471 U.S. 48, 56–59, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985). However, in order for private conduct to share in the immunity, the challenged conduct must satisfy both prongs of the two-pronged "Midcal test." Under the first prong, the defendant must show the state has articulated a clear and affirmative policy to allow the challenged conduct. *See, FTC v. Ticor Title Ins. Co.*, 504 U.S. 621, 631, 112 S.Ct. 2169, 119 L.Ed.2d 410 (1992). To meet this requirement, the defendant must show that a "regulatory structure which has been adopted by the state ... specifically authorized the conduct alleged to violate the Sherman Act." *Cost Management Services, Inc. v. Washington Natural Gas Co.*, 99 F.3d 937, 942 (9th Cir.1996). Restated, the defendant must prove the challenged anticompetitive conduct was a foreseeable result of the regulatory structure authorized by the state. *See, City of Columbia v. Omni Outdoor Advertising*, 499 U.S. 365, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991).[17] If the challenged anticompetitive conduct was a foreseeable consequence of the regulato-

---

**16.** In view of the court's determination that all of the antitrust claims fail as a matter of law (discussed below), and the court's decision to refrain from exercising supplemental jurisdiction over the pendent state claims, the court does not find it appropriate to determine whether the claims based upon state law would be barred by the filed rate doctrine.

**17.** In *Omni*, the plaintiff asserted a claim challenging a municipal zoning regulation that limited the number and location of billboards in a certain area of the city. The Supreme Court held the claim was barred by the state action doctrine because the state had authorized municipalities to enact zoning regulations, and the regulations enacted by the city restricting the number and location of billboards was a foreseeable consequence of the zoning power authorized by the state. *Omni*, 499 U.S. at 370–73, 111 S.Ct. 1344.

ry structure authorized by the state, it can be said the state contemplated the kind of anticompetitive activity engaged in by the defendant. *See, Town of Hallie v. City of Eau Claire,* 471 U.S. 34, 42, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985). Under the second prong of the *Midcal* test, the defendant must prove the state actively supervised the anticompetitive conduct. *See, Ticor Title,* 504 U.S. 621, 631, 112 S.Ct. 2169 (1992).[18]

■ In the present action, the state action doctrine does not operate to bar the antitrust claims based upon the intrastate transportation and storage of natural gas (counts 1, 2 and 5), because the first prong of the *Midcal* test is not satisfied with respect to these claims. In counts 1, 2 and 5 of the Amended Complaint, plaintiffs allege MPC participated in an illegal product tying arrangement, an illegal boycott, and an unlawful conspiracy to monopolize the sale of gas to on-system, non-core customers. The state action doctrine does not operate to bar these claims because the anticompetitive conduct alleged by plaintiffs was not a foreseeable consequence of the regulatory structure adopted by the state of Montana to regulate the intrastate transportation, sale and storage of natural gas.

### C. *Antitrust Claims Asserted by Plaintiff Marie Owens d/b/a Paladin Associates*

MPC and NARCO contend the antitrust claims asserted by PA should be dismissed because PA lacks standing to assert the claims. The court agrees.

■ Section 4 of the Clayton Act, 15 U.S.C. § 15, provides a right of action to any person injured by activities forbidden by the antitrust laws. Accordingly, a cause of action under section 4 of the Clayton Act is only available to those plaintiffs who have suffered antitrust inju-

ry. *ARCO v. USA Petroleum,* 495 U.S. 328, 344, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990). Plaintiff PA is not such an entity. All of the damages alleged by plaintiffs are predicated upon margins PAI should or would have received on sales of natural gas to on-system and off-system customers over the 15–year term of its contract with NOVA for firm transportation service on NOVA's pipeline. Only PAI was engaged in the business of selling gas. PA was solely a consulting business. Plaintiffs do not allege that PA's consulting business sustained damages as the result of the alleged antitrust violations by defendants.

It is also imperative to note that plaintiffs do not challenge this motion in their response brief. Consistent with the prescriptions of Rule 200–1 of the RULES OF PROCEDURE OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MONTANA, the court deems the plaintiffs' lack of a response as an admission that, in the opinion of counsel, the motion is well taken. Accordingly, the court deems it appropriate to grant the motion for summary judgment seeking dismissal of PA's antitrust claims for lack of standing.

### D. *Count 1—Illegal Tying Arrangement By MP and CMPL in violation of Section 1 of the Sherman Act*

As discussed above, between November 1, 1991, and November 1, 1992, MPC provided imbalance coverage to the on-system, non-core customers when their upstream supply of natural gas on the NOVA pipeline was interrupted. Six of the on-system, non-core customers later contracted with MPC for 5–year assignments of firm transportation service on NOVA's pipeline. Plaintiffs allege MPC, acting alone or in concert with CMPL, engaged in an illegal tying arrangement, in violation of section 1 of the Sherman Act, by making

---

**18.** There is a close relationship between the two prongs of the *Midcal* test. "Both are directed at ensuring that particular anticom-

petitive mechanisms operate because of a deliberate and intended state policy." *Ticor,* 504 U.S. at 636, 112 S.Ct. 2169.

the provision of imbalance coverage conditional upon the customers agreeing to purchase 5–year assignments of NOVA firm transportation service from MPC.

■ A "tying arrangement" is a device used by a competitor with market power in one market (the "tying" product market) to extend its market power to an entirely distinct market (the "tied" product market). To accomplish this objective, the competitor agrees "to sell one product (the tying product) but only on the condition that the buyer also purchase a different product (the tied product), or at least agrees that he will not purchase the tied product from any other supplier." *See, Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992).

■ Section 1 of the Sherman Act prohibits agreements or conspiracies that unreasonably restrain trade. *See,* 15 U.S.C. § 1.[19] *NYNEX Corp. v. Discon, Inc.,* 525 U.S. 128, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998). To prove a violation of section 1 of the Sherman Act, a plaintiff must show:

(1) there was an agreement, conspiracy or combination among two or more persons or distinct business entities;

(2) the agreement constituted an unreasonable restraint on trade under either

the *per se* rule or the rule of reason analysis; and

(3) the restraint affected interstate commerce.

*See, McGlinchy v. Shell Chemical Co.* 845 F.2d 802, 811 (9th Cir.1988); *American Ad Mgt., Inc. v. GTE Corp.,* 92 F.3d 781, 784–88 (9th Cir.1996).

■ A tying arrangement constitutes an unreasonable restraint on trade, in violation of section 1 of the Sherman Act if: (1) there exists two distinct products or services in different markets whose sale are tied together;[20] (2) the seller possesses appreciable economic power in the tying product market sufficient to coerce acceptance of the tied product;[21] and (3) the tying arrangement affects a "not insubstantial volume of commerce" in the tied product market.[22] *See, Kodak,* 504 U.S. at 461–62, 112 S.Ct. 2072; *Datagate, Inc. v. Hewlett–Packard Co.,* 60 F.3d 1421, 1423–26 (9th Cir.1995); *Moore,* 550 F.2d 1207.

■ The tying claim advanced by the plaintiffs may be summarily rejected because it does not involve two separate products or services offered for sale by MPC. Although the assignments of NOVA firm transportation were offered for sale by MPC, MPC's practice of providing excess gas to on-system, non-core customers

---

19. Section 1 of the Sherman Act, which deals with concerted activity, provides in pertinent part as follows:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

20. The first element has two parts. First, it must be shown there are two distinct products or services offered for sale by the defendant. *See, Jefferson Parish Hosp. v. Hyde,* 466 U.S. 2, 21, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984).

Second, it must be shown that the sale of the two products or services was tied together. *Id.* The required "tie" may be established through either direct or circumstantial evidence. A "tie" may be established with circumstantial evidence if the plaintiff shows some modicum of coercion. *Datagate, Inc. v.*

*Hewlett–Packard Co.,* 60 F.3d 1421, 1426–27 (9th Cir.1995). A modicum of coercion may be implied from circumstantial evidence if the seller possesses sufficient economic power in the tying product market and an appreciable number of buyers have accepted "burdensome terms" in order to acquire the tying product. *Moore v. Jas. H. Matthews & Co.,* 550 F.2d 1207, 1217 (9th Cir.1977).

21. The essential characteristic of an illegal tying arrangement is that a competitor makes use of its market power in the tying product market to coerce the buyer to purchase the tied product. *Datagate,* 60 F.3d at 1426.

22. The focus of the third element is whether the total amount of business foreclosed to competition by the tying arrangement is substantial enough in terms of dollar volume so as not to be merely *de minimis. Datagate,* 60 F.3d at 1425.

during NOVA interruptions was not a service or product that was sold by MPC. There is no evidence that any on-system, non-core customer had a right or entitlement to acquire imbalance coverage pursuant to a contract with MPC. Nor is there any evidence that MPC was responsible for assuring the on-system, non-core customers had a continuous supply of natural gas from their upstream suppliers. MPC merely offered to sell excess gas to the on-system, non-core customers when MPC could do so without adversely affecting its core customers, or otherwise impinging upon its system.

Defendants' motion for summary judgment with respect to count 1 is granted.

### E. Count 2—MPC, CMPL and Northridge Coerced or Persuaded On-system, Non-core Customers to Boycott or Refuse to Purchase Natural Gas from PAI in violation of Section 1 of the Sherman Act

■ Plaintiffs allege MPC, CMPL and Northridge participated in an indirect boycott designed to persuade and/or coerce the on-system, non-core customers not to purchase natural gas from PAI for a period of five years following the advent of unbundled natural gas service on November 1, 1991.[23] Plaintiffs contend defendants effected the indirect boycott by coercing the on-system, non-core customers to purchase 5–year assignments of NOVA firm transportation capacity from MPC. Once the customer acquired a 5–year assignment of NOVA firm transportation capacity from MPC, the customer would have no interest in purchasing "firm" gas from PAI for a period of five years.[24]

■ To prove a boycott claim under section 1 of the Sherman Act, plaintiffs must show:

(1) there was an agreement, conspiracy or combination among two or more persons or distinct business entities to boycott the plaintiff;

(2) the boycott was an unreasonable restraint on trade under either the *per se* rule or a rule of reason analysis; and

(3) the boycott affected interstate commerce.

*See, City of Vernon v. Southern Cal. Edison Co.*, 955 F.2d 1361, 1365 (9th Cir.1992).

Plaintiffs' boycott claim fails for two reasons. First, plaintiffs have failed to present evidence upon which a jury could reasonably infer that a conspiracy to boycott existed between MPC and Northridge. Second, the alleged boycott does not constitute an unreasonable restraint on trade under either the *per se* rule or the rule of reason analysis.

The customer could purchase "firm" gas from a gas marketer that sold firm gas by utilizing its firm transportation capacity on the NOVA pipeline, like PAI, or the customer could acquire an assignment of NOVA firm transportation service itself, and use that firm transportation service to transport, on a firm basis, any gas the customer purchased in Canada.

If an on-system customer acquired a 5–year assignment of NOVA firm transportation capacity from MPC, the customer would not be inclined to purchase firm gas from PAI for a period of five years, because the customer already had the ability to transport Canadian gas to Carway on a firm basis utilizing the firm transportation service it acquired from MPC.

---

**23.** A boycott can take the form of a direct boycott or an indirect boycott. *See, Northwest Wholesale Stationers v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 290–93, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985). A direct boycott occurs when there is a joint effort or agreement by two or more entities to refuse to deal with a competitor. *Id.* An indirect boycott occurs when two or more entities persuade or coerce others (*i.e.* customers or suppliers) to refuse to deal with a competitor. *See, Movie 1 & 2 v. United Artists Communications, Inc.*, 909 F.2d 1245, 1253 (9th Cir. 1990).

**24.** If an on-system customer wanted Canadian natural gas delivered to the Carway Interconnnect on a firm basis in November of 1992, the customer had two principal options.

### a. *Conspiracy to Boycott*

■ The threshold requirement of every claim under section 1 of the Sherman Act is an agreement to restrain trade. *Northwest Wholesale Stationers v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 294–95, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985). Accordingly, to prove an indirect boycott under section 1 of the Sherman Act, a plaintiff must show that two or more business entities persuaded or coerced suppliers or customers to refuse to deal with him. *Id.* at 295, 105 S.Ct. 2613. Unilateral conduct by a single business entity, regardless of its motivation, is not unlawful under section 1 of the Sherman Act, because a business entity "has the right to deal, or refuse to deal, with whomever it likes, as long as it does so independently." *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 761, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984); *see also The Jeanery, Inc. v. James Jeans, Inc.*, 849 F.2d 1148, 1152 (9th Cir.1988).

■ Concerted activity may be proven through either direct or circumstantial evidence. *See, Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 764–68, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). While direct evidence, the proverbial "smoking gun," is the most compelling way to prove concerted activity, direct evidence rarely exists because it requires an explicit agreement without the use of inferences. *See, Souza v. Estate of Bishop*, 821 F.2d 1332, 1335 (9th Cir.1987). Therefore, antitrust plaintiffs have been permitted to rely solely on circumstantial evidence (and the reasonable inferences that may be drawn therefrom) to prove a conspiracy, subject to certain limitations pronounced in *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and its progeny. Plaintiffs contend there exists both direct evidence and circumstantial evidence of a conspiracy in the present case.

### (i) *Direct Evidence of Concerted Activity*

■ Plaintiffs argue that the assignments of NOVA firm transportation service offered by MPC, and accepted by Northridge's customers, constitute direct evidence that MPC and Northridge engaged in a concerted effort to coerce or persuade on-system, non-core customers to boycott PAI. Plaintiffs are mistaken. Direct evidence "is evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted." *Rossi v. Standard Roofing*, 156 F.3d 452, 466 (3d Cir.1998). By their express terms, the assignments are simply lawful agreements for the sale of firm transportation service between MPC and gas customers. They do not evidence a specific intent to control prices or destroy competition through predatory or anti-competitive conduct. The assignments establish only that a number of on-system, non-core customers acquired NOVA firm transportation service from MPC and purchased Canadian natural gas from Northridge.

### (ii) *Circumstantial Evidence of Concerted Activity*

■ To make out a *prima facie* showing of concerted activity using only circumstantial evidence, and survive a motion for summary judgment, a plaintiff must present circumstantial evidence that reasonably tends to exclude the possibility that the alleged conspirators acted independently. *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). Restated, summary judgment may be properly granted in favor of a defendant if: (1) the defendant proffers a plausible and justifiable alternative interpretation of its conduct that rebuts plaintiff's allegation of conspiracy; and (2) the defendant shows that plaintiff has failed to present evidence capable of sustaining a rational inference of conspiracy—*i.e.*, evidence that tends to exclude the possibility that the defendants acted independently. *T.W. Electrical Serv., Inc. v.*

*Pacific Electrical Contractors Ass'n,* 809 F.2d 626, 632 (9th Cir.1987).

In determining whether a plaintiff has come forward with circumstantial evidence capable of sustaining a rational inference of conspiracy, courts must remain mindful of several general principles. First, ambiguous conduct which is "as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A conspiracy must be proven with unambiguous evidence that tends to exclude the possibility that the alleged conspirators acted independently. *Id.* Second, the mere opportunity to conspire, standing alone, does not support an inference of a conspiracy. *See, Wilcox v. First Interstate Bank,* 815 F.2d 522, 527 (9th Cir. 1987). Third, the plausibility of the alleged conspiracy is important. Courts "should not permit factfinders to infer conspiracies when such inferences are implausible, because the effect of such practices is often to deter procompetitive conduct." *Matsushita,* 475 U.S. at 593, 106 S.Ct. 1348. Fourth, a defendant's economic motive is highly relevant. Courts should not infer a conspiracy if the defendant has no "rationale economic motive to conspire." *Rossi v. Standard Roofing, Inc.,* 156 F.3d 452, 466 (3d Cir.1998), *citing, Matsushita,* 475 U.S. at 596, 106 S.Ct. 1348. Fifth, when examining the sufficiency of the evidence adduced by a plaintiff, the court must not tightly compartmentalize the various factual components of evidence, but rather the court must evaluate the evidence as a whole to determine whether it supports a rational inference of concerted activity. *In re Coordinated Pretrial Proceedings,* 906 F.2d 432, 441 n. 2 (9th Cir.1990).

With these principles in mind, the court now turns to the circumstantial evidence adduced by the plaintiffs in support of their contention that MPC and Northridge participated in an antitrust conspiracy. To provide a logical structure for this analysis, the court will first examine the pieces of evidence successively; having done so, the court will then be in a better position to evaluate the probative value of the evidence viewed in its entirety.

### 1. *Minion Directorships*

In 1984, Wayne Minion was the chairman of Northridge. In 1985, Mr. Minion became a member of the board of directors of Entech and several of Entech's affiliates. Plaintiffs contend Mr. Minion's simultaneous membership on the boards of Entech and Northridge violated section 8 of the Clayton Act, 15 U.S.C. § 19, and presented Northridge with an opportunity to gain information concerning MPC's competitive activities.

There is nothing conspiratorial or improper about Mr. Minion's activities. First, section 8 of the Clayton Act precludes interlocking directorates between corporate competitors. *See e.g., United States v. Sears, Roebuck & Co.,* 111 F.Supp. 614, 616–17 (S.D.N.Y.1953). Accordingly, to establish a violation of section 8, a plaintiff must prove the corporations, on whose boards the director sits, actually compete with each other. *TRW, Inc. v. Federal Trade Comm'n,* 647 F.2d 942, 945 n. 3 (9th Cir.1981); *American Bakeries Co. v. Gourmet Bakers, Inc.,* 515 F.Supp. 977 (D.Md.1981). Northridge is a marketing company whose relevant product is natural gas. In contrast, Entech is a holding company whose primary interest is coal. Mr. Minion was never a director of NARCO, Entech's gas marketing affiliate, or MPC. Moreover, plaintiffs have failed to identify a single instance where Mr. Minion used his position with Northridge to improperly obtain confidential information from MPC. The evidence presented by plaintiffs with respect to Mr. Minion shows only that Northridge may have had an opportunity to conspire with MPC. However, the mere opportunity to conspire does not support an inference of conspiracy. *See, Wilcox v.*

*First Interstate Bank,* 815 F.2d 522, 527 (9th Cir.1987).

### 2. *Northridge's Marketing Practices in 1991*

Plaintiffs contend a conspiracy may be inferred because Northridge marketed itself, in letters drafted in 1991, as having a "close working" relationship with MPC, and Northridge agreed to provide firm gas to on-system, non-core customers in 1991, before firm transportation service was available on NOVA's pipeline.

A conspiracy cannot be reasonably inferred from the fact Northridge marketed itself as having a good relationship with MPC, or from the fact Northridge offered contracts for firm gas prior to the advent of firm transportation service on the NOVA pipeline. PAI's marketing expert, C. Leslie Webber, who was employed by Northridge when the marketing letters were drafted, testified in his deposition that there was nothing improper with respect to the letters.

In 1991, gas service commensurate with firm gas could be delivered to on-system, non-core customers by using a combination of interruptible transportation service on NOVA's pipeline, on-system supplies and storage, and other unsubscribed capacity. There is no evidence that MPC was aware of the terms of Northridge's contracts for firm gas, or agreed to backstop Northridge's contracts in any way.

### 3. *PAI's Marketing Strategy*

Plaintiffs contend a conspiracy may be inferred because MPC gave Northridge PAI's "unique and innovative" marketing strategy.

This purported evidence of a conspiracy is deficient for several reasons. First, PAI did not create the referenced marketing strategy. Owens testified during her deposition that the marketing strategy was derived from public documents that were part of the proceedings of the MPSC. Second, the referenced strategy was not unique. Wayne Minion, and Northridge's marketing personnel Joel Johnson and Erin Delsig testified, in depositions and affidavits, that the strategy was a standard practice in the gas industry. Third, and most compelling, the record is void of any evidence that MPC ever communicated PAI's marketing strategy to Northridge.

### 4. *MPC's Customer List*

Plaintiffs contend a conspiracy may be inferred because MPC gave Northridge its "confidential" list of on-system, non-core customers.

There is no evidence that Northridge received a confidential list of customers from MPC. Moreover, MPC's on-system, non-core customers were identified in proceedings before the MPSC and were public knowledge. Owens testified in her deposition that she obtained MPC's list of on-system, non-core customers from public documents that were part of the MPSC proceedings.

### 5. *Imbalance Coverage*

Plaintiffs contend a conspiracy may be inferred because between November 1991 and November 1992, MPC provided imbalance coverage to the on-system, non-core customers during periods when the gas flow on the NOVA pipeline was interrupted.

A conspiracy cannot be reasonably inferred from this evidence because there is no evidence that Northridge participated in MPC's decision to provide imbalance coverage. Second, MPC had legitimate business reasons for providing the gas to the on-system, non-core customers. The gas provided to the on-system, non-core customers was excess gas that MPC could offer at no risk to its core customers, and the revenue earned from the sale of the excess gas helped offset rates paid by MPC's core customers. Third, the imbalance coverage provided by MPC had pro-competitive effects. The gas was provided on a non-discriminatory basis to all on-

system, non-core customers, including PAI's customers.

### 6. *Acquisition and Assignment of NOVA Firm Transportation Capacity*

Plaintiffs contend a conspiracy may be inferred from the fact MPC acquired firm transportation service on NOVA's pipeline and assigned a portion of that firm transportation service to the on-system, non-core customers.

A conspiracy cannot be reasonably inferred from the acquisition of the NOVA firm transportation service because there is no evidence that MPC conferred with Northridge prior to making the acquisition or was otherwise concerned about how the acquisition may affect Northridge. Moreover, MPC had a legitimate business reason for acquiring the NOVA firm transportation service. MPC purchased the NOVA firm transportation service to ensure it could deliver gas to its core customers on the coldest winter days when the demand for gas by the core customers was the highest. The NOVA firm transportation service enabled MPC to purchase gas in Canada and have the gas delivered to Carway on a firm basis when it was needed to cover peak demands.[25]

Similarly, the assignment of NOVA firm transportation service does not support a conspiracy because the assignments had pro-competitive effects for the on-system, non-core customers. The assignments were offered on a non-discriminatory basis to all on-system, non-core customers. The assignments increased the number of gas suppliers available to a customer. If a customer determined that some portion of the its gas requirements needed to be "firm," the assignments enabled the customer to select any gas supplier regardless of whether the supplier held firm transportation service on the NOVA pipeline.

Without the assignments, a customer desiring firm Canadian gas was limited to dealing with a marketer that had firm transportation service, or commit to a 15–year firm transportation obligation directly with NOVA.

### 7. *MPC's Refusal to Provide an Assignment of NOVA Firm Transportation Service to PAI in October of 1992*

In October of 1992, PAI asked MPC for a one-year assignment of NOVA firm transportation service in the amount of 8,500 Mcf/d. MPC rejected the request. Later, in November of 1992, MPC made two one-month assignments of NOVA firm transportation service to Northridge. In December of 1992, MPC made an assignment of NOVA firm transportation service to Western Gas so it could supply MPC with gas for MPC's core customers·under a winter gas contract. In July of 1993, MPC provided NARCO with a one-year assignment of NOVA firm transportation service so NARCO could supply gas under its gas supply contract with the State of Montana. Plaintiffs contend that a conspiracy may be inferred from MPC's failure to sell PAI an assignment NOVA firm transportation service, and later provide assignments to other gas suppliers, including Northridge.

The evidence regarding MPC's failure to provide PAI with an assignment of NOVA firm transportation service is at best ambiguous. MPC argues that PAI's request for an assignment was rejected because the terms requested by PAI were not acceptable. PAI, of course, argues that MPC rejected its request for firm transportation service because it was conspiring to boycott PAI. Ambiguous conduct which is as consistent with permissible activities as it is with an illegal conspiracy, does not, standing alone, support an inference of an

---

**25.** The need to assure peak-day supply had been underscored by a peak-day event of 1989 that later became known as the "Big Chill." In that event, temperatures across the region dropped rapidly and remained quite low for five days. The event seriously tested MPC's resources.

antitrust conspiracy. *See, Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### 8. *Aggregation of Nominations*

Plaintiffs contend a conspiracy may be inferred because MPC permitted Northridge to aggregate gas volume nominations instead of making point to point receipt and delivery nominations.[26]

A conspiracy cannot be reasonably inferred from plaintiffs' allegations concerning aggregation of gas volume nominations. First, there is no evidence that Northridge aggregated nominations. Second, assuming, *arguendo,* that aggregation of nominations occurred, such activity would have pro-competitive effects. It is undisputed that aggregation of nominations would be beneficial to gas customers because it would reduce customer transaction costs and avoid unnecessary accountings for gas. Third, there is no evidence that aggregation of nominations, if it occurred, was prohibited by an order of the MPSC.

### 9. *MPC's Control over NOVA Firm Transportation Capacity*

As previously discussed, in November of 1991, MPC executed a 15–year contract with NOVA for 30,000 MCF/d of firm transportation service. In 1995, NOVA agreed to modify· the contract so 10,000 Mcf/d was placed on an annual renewable term, with the remaining 20,000 Mcf/d remaining on a 15–year term. Following this modification, MPC submitted a non-binding application to NOVA for 180,000 Mcf/d of additional NOVA firm transportation service. MPC subsequently submitted two more applications for firm transportation service in the amount of 10,000 Mcf/d, for a total of 200,000 Mcf/d. Plaintiffs contend MPC submitted the applications for the purpose of gaining the ability to foreclose, through a right of first refusal, the entry of other entities that might apply for NOVA firm transportation service.

A conspiracy may not be reasonably inferred from MPC's applications for additional NOVA firm transportation service because there is no evidence that Northridge was involved in MPC's decision to submit the applications, nor is there any evidence that Northridge stood to benefit from the MPC's submission of the applications anymore than any other gas supplier.

### 10. *The Alleged Conspiracy Does Not Make Economic Sense*

Plaintiffs lack of evidence of conspiracy is compounded by the fact that the alleged conspiracy does not make economic sense. MPC, combined with its subsidiary NARCO, is a vertically integrated transporter and marketer of natural gas. NARCO, the gas marketer, markets gas in direct competition with Northridge. MPC would have no rational economic reason to conspire with Northridge to the detriment of its own subsidiary, NARCO. Courts cannot infer "economically senseless" conspiracies under circumstances in which the defendants would have no rational motive to conspire. *See, Matsushita,* 475 U.S. at 596–98, 106 S.Ct. 1348 (1986); *Richards v. Neilsen Freight Lines,* 810 F.2d 898, 902 (9th Cir.1987).

Having evaluated all of the evidence presented by plaintiffs as a whole, the court concludes the evidence is not of sufficient

---

**26.** Each day and/or month, the on-system customers (or their agent) "nominate" gas volumes they intend to receive and volumes they intend to bring on MPC's system to make up for the gas they remove from the system. A point-to-point nomination involves specifying for each volume of gas brought onto MPC's system the point at which it will be received and the point at which it will be delivered.

Aggregation is less specific. It indicates how much gas will be received at each receipt point and how much will be delivered at each delivery point, but does not specify the precise receipt point for a specific molecule of gas delivered at a delivery point. Aggregation affords gas shippers flexibility as to the source of gas it will use to make a delivery.

quantum and quality to support a reasonable inference of concerted activity between MPC and Northridge.

### b. *Unlawful Restraint on Trade— (Per Se Rule and Rule of Reason)*

To determine whether challenged activities constitute an unreasonable restraint on trade, courts apply one of two modes of analysis, depending on the nature of the concerted action at issue. *See, American Ad Mgt., Inc. v. GTE Corp.*, 92 F.3d 781, 784–88 (9th Cir.1996). The two modes of analysis are commonly referred to as the "rule of reason" analysis and the *"per se"* rule. Ordinarily, a challenged practice is analyzed under the rule of reason analysis. *Oltz v. St. Peter's Community Hospital*, 861 F.2d 1440, 1445 (9th Cir.1988).

Under the rule of reason analysis, the fact-finder reviews all of the facts, including the precise harm alleged and the business excuse provided for the challenged practice, and determines whether the anticompetitive aspects of the challenged practice outweigh its procompetitive effects. *See, Northwest Wholesale Stationers v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 290–93, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985).

The *"per se"* rule recognizes that certain kinds of practices are so harmful to competition and so rarely justified that antitrust laws do not require proof that the practice was anticompetitive under the circumstances of a particular case. *Austin v. McNamara*, 979 F.2d 728, 738 (9th Cir.1992). The practices that fall within the *per se* category are: (1) horizontal and vertical price-fixing; (2) horizontal market division; (3) certain group boycotts; (4) tying arrangements; and (5) output limitations. *McGlinchy v. Shell Chemical Co.* 845 F.2d 802, 811 n. 3 (9th Cir. 1988); *American Ad Mgt., Inc. v. GTE Corp.*, 92 F.3d 781, 784 (9th Cir.1996). When presented with a practice that falls within the *per se* category, a court is not required to conduct an elaborate analysis into the precise harm caused by the restrain or the business excuse for its use, because the anticompetitive effects of the practice are presumed. *Big Bear Lodging Association v. Snow Summit, Inc.*, 182 F.3d 1096, 1101 (9th Cir.1999). The determination of whether the challenged practice warrants *per se* treatment or rule of reason treatment is important because that determination dramatically affects the quantum of proof plaintiffs must offer to sustain their claim. *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 461 (3d Cir. 1998).

In the present case, plaintiffs allege the challenged boycott constitutes an unreasonable restraint on trade under both the *per se* rule and the rule of reason analysis. A boycott constitutes a *per se* violation only if the boycott involves a "horizontal agreement among direct competitors." *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 119 S.Ct. 493, 498, 142 L.Ed.2d 510 (1998); *see also Nova Designs, Inc. v. Scuba Retailers Association*, 202 F.3d 1088, 1092 (9th Cir.2000). The boycott alleged in the present case does not support a *per se* boycott claim because it is not premised upon a horizontal agreement among direct competitors. The alleged boycott involves purely a vertical agreement between a gas utility with firm transportation service on NOVA's pipeline—*i.e.*, MPC, and a gas marketer that competes with PAI for the sale of unbundled natural gas to on-system, non-core customers—*i.e.*, Northridge. Because MPC and Northridge are not direct competitors with respect to the sale of unbundled natural gas to on-system, non-core customers, plaintiffs' *per se* boycott claim may be summarily dismissed.

In order to prove a boycott constitutes an unreasonable restraint on trade under the rule of reason analysis, a plaintiff must prove: (1) the alleged boycott was intended to harm or restrain trade; (2) actual injury to competition occurred; and (3) the restraint on trade caused by the alleged boycott was "unreasonable," as

determined by balancing the anticompetitive aspects of the boycott with its procompetitive effects. *American Ad Management, Inc. v. GTE Corp.,* 92 F.3d 781, 789 (9th Cir.1996).

### 1. *Actual Injury to Competition*

■ Antitrust laws are designed to protect competition, not competitors. *Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 338, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990). Accordingly, to establish an unreasonable restraint on trade under the rule of reason approach, a plaintiff must show the challenged activity actually injured competition—*i.e.,* caused a reduction in competition within the relevant market.[27] *Adaptive Power Solutions v. Hughes Missile Systems Co.,* 141 F.3d 947, 950–51 (9th Cir.1998).

The boycott alleged in the present case does not constitute an unreasonable restraint on trade under the rule of reason analysis because there is no evidence the alleged anticompetitive conduct—*i.e.,* MPC's sale of 5–year assignments of NOVA firm transportation service—caused actual injury to competition within the market for gas sales to on-system, non-core customers. To the contrary, it is clear that the assignments enhanced competition in the market for gas sales to on-system, non-core customers by increasing the options available to customers seeking gas on a firm basis. The on-system customers were not limited to purchasing firm gas from marketers with firm transportation service on NOVA's pipeline, but instead, could purchase gas from a number of marketers and producers and use their own firm transportation service to deliver the gas to Carway on a firm basis.

It is also imperative to note that once a gas customer acquired an assignment of NOVA firm transportation service from MPC, the customer was free to purchase gas from any gas supplier, including PAI. The affidavits of the on-system customers that acquired assignments from MPC reveal that their decision to acquire the assignment was not coerced by MPC, and MPC did not attempt to restrict the customers' selection of a gas supplier in any way.

Defendants' motion for summary judgment with respect to count 2 is granted.

### F. *Count 3—Actual Monopoly—MPC and NARCO Monopolized Access through MPC's System to the Grizzly Interconnect, Inclusive of the Dry Creek Storage Field, thereby Limiting the Transportation and/or Sale of Natural Gas to Off-system Customers*

■ In contrast to section 1 of the Sherman Act, section 2 focuses on unilateral activity, punishing every person who monopolizes or attempts to monopolize trade in interstate commerce, or conspires with another person to monopolize trade in interstate commerce.[28] *See* 15 U.S.C. § 2; *Amarel v. Connell,* 102 F.3d 1494, 1521 (9th Cir.1996). To prove a traditional monopoly claim under section 2 of the Sherman Act, a plaintiff must establish three elements: (1) the possession of monopoly power in the relevant market;[29] (2) willful

---

27. The term "relevant market" encompasses notions of geography as well as product use, quality and description. The geographic market is the "area of effective competition" where buyers can turn for alternate sources of supply. *Moore v. Jas. H. Matthews & Co.,* 550 F.2d 1207, 1218 (9th Cir.1977). "The product market includes the pool of goods or services that enjoy reasonable interchangeability of use and cross-elasticity of demand." *Oltz v. St. Peter's Community Hospital,* 861 F.2d 1440, 1446 (9th Cir.1988).

28. Section 2 of the Sherman Act provides in pertinent part as follows:

Every person who shall monopolize, or attempt to monopolize, or combine or conspire or with any person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony ....

29. Monopoly power is defined as "the power to control prices or exclude competition." *United States v. E.I. du Pont de Nemours &*

acquisition or maintenance of that monopoly power (as distinguished from growth or development as a consequence of a superior product, business acumen or historic accident); and (3) antitrust injury caused by the wrongful conduct. *Image Technical Servs., Inc. v. Eastman Kodak,* 125 F.3d 1195, 1202 (9th Cir.1997).

■ Plaintiffs base their monopoly claim on the "essential facilities" doctrine. *See, Otter Tail Power Co. v. United States,* 410 U.S. 366, 377–79, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973); *Alaska Airlines, Inc. v. United Airlines, Inc.,* 948 F.2d 536, 542 (9th Cir.1991). Stated generally, the essential facilities doctrine imposes liability when one firm, which has monopoly power over an essential facility, denies a second firm reasonable access to the facility which the second firm needs to compete with the first firm. *See, Alaska Airlines,* 948 F.2d at 542. By controlling the "essential facility," a monopolist can potentially "extend monopoly power from one stage of production to another, and from one market into another." *City of Anaheim v. Southern Cal. Edison Co.,* 955 F.2d 1373, 1379 (9th Cir.1992). To prevent this potential expansion of monopoly power, the Sherman Act imposes a duty on the owner of an essential facility to open it to competitors on a nondiscriminatory basis. *Ferguson v. Greater Pocatello Chamber of Commerce,* 848 F.2d 976, 983 (9th Cir.1988).

■ To prove a monopoly claim via the essential facilities doctrine, the plaintiff must show: (1) the defendant is a monopolist[30] with control over a facility that is "essential"; (2) a competitor is unable practicably or reasonably to duplicate the facility; (3) a competitor is denied access to the facility by the defendant; (4) providing access to the facility was feasible;[31] and (5) plaintiff incurred antitrust injury as a result of the wrongful conduct. *City of Anaheim v. Southern Cal. Edison Co.,* 955 F.2d 1373, 1380 (9th Cir.1992);. *MCI Communications Corp. v. AT & T,* 708 F.2d 1081, 1132–33 (7th Cir.1983).

Plaintiffs allege MPC and NARCO are liable under the essential facilities doctrine because they are monopolists[32] with control over a facility essential to gas marketers competing in the natural gas market downstream of the Grizzly Interconnect (*i.e.,* MPC's pipeline from Carway Interconnect to the Grizzly Interconnect, and MPC's natural gas storage facility at the Dry Creek Storage Field), and MPC and NARCO have utilized their control over the transportation and storage of gas on MPC's system to exclude Paladin from competing in the sale of natural gas to off-system customers located downstream of the Grizzly Interconnect.

■ Plaintiffs' monopoly claim, based upon the essential facilities doctrine, fails for several reasons. First, MPC's system, inclusive of the Dry Creek Storage Field, is not an "essential facility" with respect to

Co., 351 U.S. 377, 391, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). To prove a defendant is a monopolist, the plaintiff must show the defendant possesses monopoly power in the relevant geographic and product markets.

30. To prove that the defendant is a monopolist in an essential facilities case, the plaintiff must define several markets: (1) the relevant product market for the alleged essential facility (the "primary product market"); (2) the relevant product market for the potentially monopolized product (the "secondary product market"); and (3) the relevant geographic markets. *See, David L. Aldridge Co. v. Microsoft Corp.,* 995 F.Supp. 728, 752 (S.D.Tex. 1998).

31. The fourth element (feasibility) basically raises the issue of whether there is a legitimate business justification for the refusal to provide plaintiff access to the facility. *City of Anaheim,* 955 F.2d at 1380.

32. Plaintiffs contend MPC is a monopolist because it currently possesses approximately 85% of the firm transportation capacity on the NOVA system, complete control over its pipeline from Carway to Grizzly, and complete control over its storage field at Dry Creek. Plaintiffs contend NARCO is a monopolist because it controls 100% of the firm transportation service on the CIG pipeline with a primary receipt point at Grizzly.

the sale of gas to off-system customers located downstream of the Grizzly Interconnect. An "essential facility" is one which is vital to the plaintiff's competitive vitality. Accordingly, a facility is considered "essential" only if control of the facility carries with it the power to eliminate competition in a downstream market. *Alaska Airlines, supra.,* 948 F.2d at 544. MPC's system, including the Dry Creek Storage Field, does not carry with it the power to eliminate competition in the sale of gas in the off-system markets downstream of the Grizzly Interconnect. There is no evidence that competition in the downstream market on the CIG pipeline is dependent upon a supply of gas entering the CIG pipeline from MPC's system, via the Grizzly Interconnect. To the contrary, it is undisputed that gas customers on the CIG system receive gas from sources other than MPC's system, and were receiving gas from other sources long before the Grizzly Interconnect was entered into service in 1991.

Second, the essential facilities doctrine requires that the defendant-monopolist have control over the essential facility. In the present case, there is no evidence that NARCO has any control over MPC's pipeline or MPC's storage facility. To the contrary, plaintiffs concede MPC has complete control over its pipeline and storage facility at Dry Creek.

Third, the essential facilities doctrine is inapplicable where the alleged monopolist and the plaintiff do not compete in the secondary product market. *See, Ferguson v. Greater Pocatello Chamber of Commerce,* 848 F.2d 976, 983 (9th Cir.1988); *Thomas v.. Network Solutions, Inc.,* 176 F.3d 500, 509 (D.C.Cir.1999). There is no evidence that MPC competed against plaintiffs for the sale of natural gas to off-system customers located downstream of the Grizzly Interconnect. Only NARCO competed in that market.

Fourth, plaintiffs cannot show MPC denied PAI access to MPC's pipeline or storage facility at Dry Creek. From November 1, 1992, through November 1, 1993, PA possessed an OPT contract with MPC authorizing OPT transportation service across MPC's system to the Grizzly Interconnect, in the amount of 10,000 Mcf/d. Additionally, PAI held IT contracts authorizing interruptible transportation service to the Grizzly Interconnect and IS contracts authorizing PAI to store gas at MPC's Dry Creek storage facility. Plaintiffs' real complaint is that OPT shippers did not have preferential access to the storage facility at Dry Creek superior to the rights of IT shippers.

Defendants' motion for summary judgment with respect to count 3 is granted.

### G. Count 4—Attempt to Monopolize— MPC and NARCO Attempted to Monopolize Access through MPC's System to the Grizzly Interconnect, Inclusive of the Dry Creek Storage Field, thereby Limiting the Transportation and/or Sale of Natural Gas to Off-system Customers

A claim for "attempted monopolization" arises when the danger of monopolization is clear and present, but before a full blown monopoly has been accomplished. *See, Alaska Airlines, Inc. v. United Airlines, Inc.,* 948 F.2d 536, 544 (9th Cir.1991). To prove a traditional attempted monopolization claim under section 2 of the Sherman Act, a plaintiff must show: (1) a specific intent to monopolize a relevant market—*i.e.,* an intent to control prices or destroy competition in a relevant market; (2) predatory or anticompetitive conduct designed to control prices or destroy competition; (3) a dangerous probability of success—*i.e.,* a probability of achieving monopoly power in the relevant market; and (4) causal antitrust injury. *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993); *Image Technical Servs. v. Eastman Kodak Co.,* 125 F.3d 1195, 1202

(9th Cir.1997).[33]

Plaintiffs base their claim for attempted monopolization on an essential facilities theory. Because plaintiffs base their claim for attempted monopolization on an essential facilities theory, it necessarily fails for the same reason plaintiffs' monopoly claim failed.

Defendants' motion for summary judgment with respect to count 4 is granted.

### H. Count 5—Conspiracy by MPC and Northridge to Monopolize the Distribution of Natural Gas to On-system, Non-core Customers

Plaintiffs allege MPC and Northridge conspired with the intent to achieve and maintain monopoly power in the distribution of natural gas to on-system, non-core customers.

■■■ To prove a conspiracy to monopolize, in violation of section 2 of the Sherman Act, a plaintiff must show four elements: (1) the existence of a combination or conspiracy to monopolize; (2) an overt act in furtherance of the conspiracy; (3) the specific intent to monopolize; and (4) causal anti-trust injury. *United States v. Yellow Cab Co.*, 332 U.S. 218, 225, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947); *Modesto Irrigation District v. Pacific Gas & Electric Co.*, 61 F.Supp.2d 1058, 1069–70 (N.D.Cal. 1999).

To prove a conspiracy to monopolize claim, a plaintiff must begin by proving that a conspiracy existed between the defendants. The standard for proving a conspiracy under section 2 of the Sherman Act, is the same standard used to prove a conspiracy under section 1 of the Sherman Act. *See, In re Coordinated Pretrial Proceedings*, 906 F.2d 432, 460–65 (9th Cir. 1990). The evidence that plaintiffs rely upon to satisfy the concerted activity element of the present claim is the same evidence plaintiffs relied upon to prove a conspiracy for purposes of their boycott claim. Because the court previously ruled that the referenced evidence was not sufficient to establish a conspiracy for purposes of section 1 of the Sherman Act, it logically follows that the same evidence is not capable of sustaining a rationale inference of conspiracy for purposes of the present claim asserted under section 2 of the Sherman Act. Therefore, the court deems it appropriate to grant defendants' motion for summary judgment with respect to count 5.[34]

### I. Pendent State Claims

The remaining claims for relief asserted in the Amended Complaint are founded upon the law of the State of Montana. Having determined that the federal antitrust claims fail as a matter of law, the court deems it appropriate to exercise its discretion under 28 U.S.C. § 1367(c)(3), and refrain from exercising supplemental jurisdiction over the remaining state law claims.

### CONCLUSION

Therefore, for the reasons set forth herein,

IT IS HEREBY ORDERED that:

1. The motion for summary judgment submitted by MPC and NARCO challenging the antitrust claims on the ground they are barred by the filed rate doctrine is DENIED.

2. The motion for summary judgment submitted by MPC and NARCO challenging the antitrust claims on the ground they are barred by the state action doctrine is DENIED.

---

**33.** The elements of a traditional attempted monopolization claim and a traditional monopoly claim are similar, differing primarily with respect to the requisite intent and the necessary level of monopoly power. *See, Image Technical Servs.*, 125 F.3d at 1202.

**34.** Because the antitrust claims may be appropriately dismissed for the reasons set forth above, the court does not find it necessary to address the other challenges asserted by the defendants in opposition to the antitrust claims.

3. The motions for summary judgment submitted by the defendants challenging the antitrust claims on the ground they lack merit as a matter of law are GRANTED.

4. The motion for summary judgment submitted by MPC and NARCO challenging the antitrust claims asserted by Marie Owens d/b/a Paladin Associates on the ground PA lacks standing is GRANTED.

5. In view of the court's ruling, all of the other motions pending before the court become moot, and are therefore appropriately DENIED, with the exception of defendants' motions for costs and attorney fees incurred with respect to the supplemental depositions of Robert Franz and C. Leslie Webber, and Northridge's motion for costs and attorney's fees incurred in responding to plaintiffs' Counter-motion to Strike and Limit Certain Defense Experts. The court will rule on these remaining motions after the settlement conference scheduled for May 9, 2000.

IT IS FURTHER ORDERED that the pendent state claims asserted by plaintiffs are DISMISSED without prejudice to the right of plaintiffs to prosecute the claims in the courts of the State of Montana.