PALADIN ASSOCIATES, INC., a Montana corporation; Marie G. Owens, dba Paladin Associates, Inc., Plaintiffs–Appellants,

v.

MONTANA POWER COMPANY, a Montana corporation; North American Resources Company, a Montana corporation, Defendants–Appellees,

and

Northridge Petroleum Marketing, Inc., a Canadian corporation; Transcanada Gas Services Limited, a Canadian corporation, fka Northridge Gas Marketing, Inc.; Northridge Petroleum and Transcanada, Defendants.

No. 01–35849.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 7, 2003.

Filed May 13, 2003.

Thomas P. McMahon, Powers Phillips; Richard L. Fanyo, Dufford & Brown, Denver, CO; Michael J. Uda, Doney Crowley Bloomquist & Uda, Helena, MT, for the plaintiffs-appellants.

Nick S. Verwolf and Alan S. Middleton, Davis Wright Tremaine, Seattle, WA, for the defendants-appellees.

Before: REINHARDT, W. FLETCHER, and GOULD, Circuit Judges.

## OPINION

GOULD, Circuit Judge.

This case involves an array of antitrust law challenges to what we conclude are reasonable and unremarkable business practices. A Montana natural gas marketer sued a Montana natural gas pipeline company for alleged violations of the antitrust laws. The plaintiff marketer claimed that the defendant pipeline company unlawfully monopolized an essential gas pipeline and storage facility in southern Montana, unlawfully tied together the sales of two products, and unlawfully conspired with another natural gas marketer, a competitor of the plaintiff, to organize a group boycott that forced the plaintiff out of business. Viewing the evidence in the light most favorable to the plaintiff, we affirm the judgment of the district court granting summary judgment to the defendants.

**I**

Plaintiff Paladin Associates, Inc. (Paladin) is a Montana corporation that marketed natural gas to industrial customers within Montana and other western states.[1] Paladin obtained natural gas from producers in Canada and Montana and arranged for the gas to be transported to its customers through a pipeline owned by the defendant, the Montana Power Company (MPC). MPC's pipeline runs from the Montana–Canada border on the north to the Montana–Wyoming border on the south. The pipeline connects to several industrial customers' facilities in Montana.

Gas produced in Canada is delivered into MPC's pipeline via the NOVA Corporation's pipeline in Alberta, Canada. Gas produced in Montana is delivered into MPC's pipeline via another pipeline in north-central Montana. Some of the gas transported interstate across MPC's pipeline is delivered into the Colorado Interstate Gas Company (CIG) pipeline at the "Grizzly Interconnect" in Grizzly, Montana. The CIG pipeline, which receives natural gas from many sources in addition to MPC's Grizzly Interconnect, extends in a southeasterly direction to Texas and the Oklahoma Panhandle and connects with other pipelines that serve markets in California.

Natural gas and natural gas transportation services are sold separately. Natural gas customers can purchase natural gas as a commodity from one seller and then contract with a different seller to transport that gas by pipeline to the customer's location.[2]

---

1. Our statement of facts is adapted from the district court's description. Both parties stipulate that the district court's description is accurate.

2. MPC's operation of its gas transmission and storage facilities is regulated by both the Montana Public Service Commission and the Federal Energy Regulatory Commission. No party has asserted that regulation has immunized MPC's operations from the antitrust law challenges presented in this action.

In 1991 and 1992, NOVA, the Canadian pipeline company, at times interrupted gas delivery service, causing customers on MPC's pipeline in Montana to experience shortages. During these interruptions, MPC "covered" customers by providing them excess gas MPC had in storage. After an interruption ended, customers returned to MPC the quantity of excess gas that MPC had advanced the customer during the interruption. Although customers were contractually obliged to pay MPC a "balancing penalty" for extracting gas to which they were not entitled from the MPC pipeline, MPC did not charge customers the balancing penalty for the gas it advanced during the NOVA interruptions.

Before these interruptions, MPC had purchased from NOVA a fifteen-year assignment of 30 million cubic feet per day of non-interruptible gas transportation service on NOVA's pipeline. In June of 1992, MPC notified customers that it was reselling this capacity as five-year assignments of NOVA transportation service. The assignments were attractive to customers because they could purchase Canadian gas from any marketer or producer and have the gas delivered to MPC's pipeline through the NOVA pipeline. With Northridge Petroleum (a natural gas marketer and competitor of Paladin) acting as an intermediary, six of the twelve industrial customers on the MPC pipeline bought five-year assignments of NOVA transportation from MPC. As part of these transactions, Northridge and MPC executed several contracts.[3]

Like MPC, Paladin had purchased from NOVA 30 million cubic feet per day of non-interruptible transportation service on NOVA's pipeline, in hopes of reselling that capacity to the industrial customers on MPC's pipeline. But once the customers had purchased NOVA transportation from MPC (with Northridge acting as an intermediary), these customers had little incentive to buy transportation from Paladin. As a result, Paladin alleged that it was required to sell its NOVA transportation service to another gas marketer at a reduced price. Paladin claimed that it left the market altogether because of its alleged losses.

Paladin filed suit in the district court alleging federal anti-trust and state-law tort claims. Paladin alleged that MPC and Northridge's collaboration to sell NOVA transportation to customers violated the Sherman Act in two ways. First, Paladin alleged that MPC's assignments to Northridge created an illegal group boycott of Paladin because the assignments had the effect of filling customers' NOVA transportation needs for a five-year period, thereby preventing Paladin from selling its own NOVA capacity to the customers. Second, Paladin alleged that MPC coerced customers to buy its assignments of NOVA transportation service by threatening to stop covering gas shortages caused by interruptions on NOVA's pipeline. Paladin claimed this amounted to an illegal "tying arrangement." Finally, Paladin alleged that the Grizzly Interconnect and the near-

3. In these contracts, MPC assigned NOVA transportation rights directly to Northridge. Northridge subsequently reassigned the NOVA transportation rights to Northridge's natural gas customers. Some documents in the record refer to Northridge as the customers' "agent." Whether Northridge was acting as its customers' agent or acting in some other intermediary capacity does not affect the substance of Paladin's § 1 claims: that

MPC and Northridge entered into agreements and that those agreements (which contemplated assignment of MPC's NOVA capacity to natural gas customers in a two-step transaction) effected an indirect boycott of Paladin. In other words, Paladin claims that MPC and Northridge collaborated in agreeing to sell long-term assignments of NOVA transportation to customers, thereby driving Paladin from the market.

by Dry Creek Storage facility together constituted an "essential facility" that MPC and its subsidiary NARCO illegally monopolized.[4]

The district court granted summary judgment to the defendants on the antitrust claims and then exercised its discretion under 28 U.S.C. § 1367(c)(3) to refrain from exercising supplemental jurisdiction over the state-law claims. The district court also ordered Paladin to pay MPC approximately $27,000 in costs and attorneys' fees for twice violating discovery rules.

Paladin appealed.

## II

Paladin alleges that MPC and Northridge participated in an indirect boycott designed to persuade industrial customers on MPC's pipeline not to purchase natural gas transportation from Paladin for a period of five years. Paladin contends that the defendants effected an indirect boycott by coercing customers to purchase five-year assignments of NOVA non-interruptible transportation capacity from MPC. Once the customers acquired a five-year assignment of MPC's NOVA non-interruptible transportation capacity, Paladin claims, the customer would not purchase that product from Paladin for a period of five years.

■ To prove an illegal boycott under § 1 of the Sherman Act in the circumstances here, Paladin must show (1) an agreement, conspiracy, or combination among two or more entities and (2) that the agreement, conspiracy, or combination was unreasonable. *Am. Ad. Mgmt. v. GTE Corp.*, 92 F.3d 781, 788 (9th Cir. 1996).[5] We consider each element in turn.

### A

■ MPC's five-year assignments of NOVA non-interruptible transportation to Northridge were express "agreements." These documents, signed by representatives of MPC and Northridge, are direct evidence of "concerted activity," so the defendants are not entitled to summary judgment on the ground that Paladin has offered no evidence to satisfy the first element of a § 1 claim. Instead, the district court's focus should have been on the second element, whether the agreements were unreasonable.

■ The district court held, however, that there was no direct evidence of concerted activity. *See Paladin Assocs., Inc. v. Montana Power Co.*, 97 F.Supp.2d 1013, 1030 (D.Mont.2000). We conclude that the district court reached this erroneous conclusion by improperly grafting an additional requirement—specific intent to destroy competition—onto the element of Paladin's prima facie case requiring that the defendants acted in concert.[6] Our antitrust law is clear that Paladin need not prove intent to control prices or destroy competition to demonstrate the element of "an agreement

---

4. Paladin has asked us for leave to supplement the record on appeal. We deny Paladin's motion. The excerpt from Rich Swinney's deposition at RSRE (1)-(3) and the documents at RSRE(7)-(12) already are part of the record, so we may consider this evidence without supplementing the record. In contrast, the excerpt from Marie Owens's deposition at RSRE (4)-(6) was never presented to the district court, so we will not consider it. *See, e.g., United States v. Elias*, 921 F.2d 870, 874 (9th Cir.1990).

5. Of course, the restraint also must affect interstate commerce for the Sherman Act to apply. *Am. Ad. Mgmt.*, 92 F.3d at 788.

6. The district court held that the defendants' assignments were not direct evidence of concerted activity because "[t]hey do not evidence a specific intent to control prices or destroy competition through predatory or anti-competitive conduct." *Paladin Assocs.*, 97 F.Supp.2d at 1030.

... among two or more entities." *See Am. Ad. Mgmt.*, 92 F.3d at 788 (not listing intent as an element of the plaintiff's prima facie case under Sherman Act § 1); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Assoc.*, 809 F.2d 626, 632–33 (9th Cir.1987) (same); *Eichman v. Fotomat Corp.*, 880 F.2d 149, 161 (9th Cir.1989) (same); *see also McLain v. Real Estate Bd. of New Orleans*, 444 U.S. 232, 243, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980) (noting that specific intent to destroy competition is not an element of a civil antitrust claim). Although a defendant's predatory intent may be relevant in determining whether a particular agreement is *unreasonable, see Am. Ad. Mgmt.*, 92 F.3d at 789, it is not required to prove the *existence* of an agreement.

For this element, it is sufficient that Paladin has offered evidence that MPC and Northridge signed agreements assigning certain contract rights. Thus, Paladin has offered evidence of "an agreement ... among two or more entities." [7] The district court erred in concluding that the assignments were not direct evidence of concerted action.

**B**

■ Having determined that MPC's assignments of NOVA transportation to Northridge were "agreements," we turn next to the question of whether those agreements were "unreasonable" under § 1 of the Sherman Act. *Am. Ad. Mgmt.*, 92 F.3d at 788. *See also N'west Wholesale Stationers, Inc. v. Pac. Stationery and Printing Co.*, 472 U.S. 284, 289, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985). To determine whether the assignments were unreasonable, we must decide at the threshold whether they were per se illegal or whether they must be analyzed under the "rule of reason."

■ Treating an agreement as per se illegal is appropriate only if the agreement falls within the category of "agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *N'west Wholesale Stationers*, 472 U.S. at 289, 105 S.Ct. 2613. The decision to apply the per se rule turns on "whether the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output." *Id.* at 289–90, 105 S.Ct. 2613. *See also Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 103–04, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984) *("Per se* rules are invoked when surrounding circumstances make the likelihood of anticompetitive conduct so great as to render unjustified further examination of the challenged conduct.").

■ The Supreme Court generally has treated as per se illegal joint efforts by firms to disadvantage a competitor by persuading customers to deny that competitor relationships the competitor needs in the

---

7. The Supreme Court's cases demonstrate that *"every* commercial agreement" is a "restraint of trade," *N'west Wholesale Stationers, Inc. v. Pac. Stationery and Printing Co.*, 472 U.S. 284, 289, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985), meaning that every commercial agreement, including the assignments here, is "an agreement ... among two or more entities," in the words of the Ninth Circuit's prima facie § 1 claim. The Supreme Court has stated

that "the legality of an agreement or regulation cannot be determined by so simple a test, as whether it restrains competition. Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence." *Chicago Board of Trade v. U.S.*, 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683 (1918). Not every commercial agreement is an illegal *unreasonable* restraint of trade, however.

competitive struggle. *E.g., Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.,* 364 U.S. 656, 659–60, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961); *Associated Press v. United States,* 326 U.S. 1, 15, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945); *Klor's, Inc. v. Broadway–Hale Stores, Inc.,* 359 U.S. 207, 212, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). But in these cases, the practices generally were not justified by plausible arguments that the practices enhanced overall efficiency and made markets more competitive. *N'west Wholesale Stationers,* 472 U.S. at 294, 105 S.Ct. 2613. When a defendant advances plausible arguments that a practice enhances overall efficiency and makes markets more competitive, per se treatment is inappropriate, and the rule of reason applies.[8] *See id.* at 295, 105 S.Ct. 2613. *See also Nat'l Collegiate Athletic Ass'n,* 468 U.S. at 100–01, 104 S.Ct. 2948 (rejecting per se treatment of the NCAA's restrictions on the marketing of televised college football).

Here, there are several plausible arguments that the five-year assignments of NOVA transportation rights were procompetitive. It can be argued plausibly that the assignments improved customer choice by giving customers a new way to purchase transportation; that the assignments gave customers more flexibility to choose suppliers; that the assignments allowed customers to avoid the transaction costs of annual renegotiation; and that the assignments provided customers with a better value over the life of the contract. These justifications are not only plausible, they are persuasive that the assignments are in the realm of permissible competition that cannot be considered per se unlawful. To treat such routine assignments as per se

unlawful would not square with common sense or common distribution practices.

■ Paladin argued at oral argument that the assignments are per se illegal because, in Paladin's view, Northridge and MPC are competitors. Northridge competes with NARCO, an MPC subsidiary that markets natural gas. According to Paladin, Northridge and MPC (through its subsidiary) are competitors, and the agreements between them are per se illegal horizontal agreements between competitors. But not all horizontal agreements between competitors are per se invalid. *See, e.g., N'west Wholesale Stationers,* 472 U.S. at 295, 105 S.Ct. 2613; *Broad. Music, Inc. v. CBS,* 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979); *Nat'l Collegiate Athletic Ass'n,* 468 U.S. at 100–101, 104 S.Ct. 2948. *See also generally* U.S. Dep't of Justice & Federal Trade Comm'n, *Antitrust Guidelines for Collaboration Among Competitors* (2000) (providing guidance on evaluating "collaboration among competitors" under antitrust law), *reprinted in* 4 Trade Reg. Rep. (CCH) ¶ 13,161. And, even if Northridge and MPC are, in a sense, competitors, the type of agreement at issue here cannot be considered one that will "always or almost always tend to restrict competition." *N'west Wholesale Stationers,* 472 U.S. at 289, 105 S.Ct. 2613. The agreements are not per se illegal.

Because there are plausible procompetitive justifications for the agreements assigning transportation, we hold that the agreements are not per se unlawful. We thus proceed to a rule-of-reason analysis.

---

**8.** This is so because plausible arguments that a practice is procompetitive make us unable to conclude "the likelihood of anticompetitive effects is clear and the possibility of counter-

vailing procompetitive effects is remote." *N'west Wholesale Stationers,* 472 U.S. at 294, 105 S.Ct. 2613.

\* \* \*

The rule of reason weighs legitimate justifications for a restraint against any anticompetitive effects.[9] We review all the facts, including the precise harms alleged to the competitive markets, and the legitimate justifications provided for the challenged practice, and we determine whether the anticompetitive aspects of the challenged practice outweigh its procompetitive effects. *See N'west Wholesale Stationers,* 472 U.S. at 290–93, 105 S.Ct. 2613; *see also Cal. Dental Ass'n v. FTC,* 224 F.3d 942, 947 (9th Cir.2000) (on remand from the Supreme Court). MPC's assignments of NOVA transportation rights are anticompetitive if they "[harm] allocative efficiency and raise[ ] the prices of goods above competitive levels or diminish[ ] their quality" in the market for NOVA non-interruptible transportation.[10] *Rebel Oil Co. v. Atl. Richfield Co.,* 51 F.3d 1421, 1433 (9th Cir.1995).

We conclude that there is no genuine dispute as to the material facts. Paladin and MPC each purchased 30 million cubic feet per day of non-interruptible transportation rights from NOVA with the intent of reselling those rights to customers on the MPC pipeline. In this sense, Paladin and MPC became competitors. MPC, working with Northridge, offered NOVA transportation rights to MPC's transportation customers for five-year terms. The six customers who bought five-year supplies of NOVA transportation rights had no need to buy additional transportation from Paladin. Paladin's evidence, which must be credited at this stage, was that as a result Paladin was forced to sell its rights to another company, CHMI/Engage, and thus was forced out of the market. Viewed in this light, the five-year assignments had the effect of removing one competitor from the market to provide NOVA non-interruptible transportation rights. After Paladin's departure and after the expiration of the five-year assignments, MPC reduced the quantity of transportation rights it sold, selling 5 million cubic feet per day instead of 30 million. It also reduced the quality of transportation rights it sold, selling only "interruptible," not "non-interruptible," transportation.

Paladin argues that its departure from the market, as a result of MPC's marketing success, and MPC's subsequent reduction in the supply of NOVA non-interruptible transportation rights were anticompetitive effects of MPC's assign-

**9.** Justice Brandeis delivered the Supreme Court's classic statement of the rule of reason in *Chicago Board of Trade v. United States,* holding:

The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts.

246 U.S. at 238, 38 S.Ct. 242.

**10.** Paladin argues that the relevant market is for NOVA non-interruptible transportation. We agree. The Supreme Court has held that a "market is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered." *Int'l Boxing Club of N.Y., Inc. v. United States,* 358 U.S. 242, 250, 79 S.Ct. 245, 3 L.Ed.2d 270 (1959). It does not appear from the record that a buyer of Canadian gas has any alternative means of transporting non-interruptible gas to Montana other than through the NOVA system. It thus appears that no transportation product has "reasonable interchangeability" with NOVA non-interruptible transportation. MPC makes no substantive argument to the contrary.

ments. However, even if these results can be characterized as anticompetitive, the five-year assignments still were reasonable if the procompetitive justifications for them outweighed the alleged anticompetitive effects. Here, even if we give Paladin the benefit of all reasonable inferences from the evidence, the procompetitive justifications still plainly outweighed the alleged anticompetitive effects.

First, assigning transportation on a five-year basis is more efficient than assigning transportation on a yearly basis, because it eliminates the transaction costs of renegotiating agreements on a yearly basis. Such efficiencies are procompetitive. Second, the five-year assignments were a new "product" that filled a need. They provided a new option for purchasers of transportation rights. Improving customer choice is procompetitive.[11] MPC offered the assignments in an effort to compete with marketers like Paladin. Indeed, were we to hold that the Sherman Act disfavors a business's offering new products, such as MPC's five-year assignments, we would restrict an important form of non-price competition. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993) ("The [Sherman Act] directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself.").

Third, it does not appear that the five-year assignments harmed the market, even in the short term. Sellers other than MPC (such as CHMI/Engage, which bought Paladin's transportation rights, and other holders of NOVA transportation rights) remained.[12] That Paladin in the

---

**11.** Natural gas transportation customers testified that MPC's offering five-year assignments of NOVA non-interruptible *transportation* had a procompetitive effect in a separate market: the market for *natural gas* as a commodity. Once customers acquired five-year assignments of NOVA transportation rights, they believed they gained flexibility to choose from competing suppliers of natural gas. Customers' improved power to choose from competing natural gas suppliers undoubtedly is procompetitive in the market for natural gas. It may be, however, that this procompetitive effect should not be considered in our rule of reason analysis, based on the theory that procompetitive effects in a separate market cannot justify anti-competitive effects in the market for pipeline transportation under analysis. This theory might find some support in the Supreme Court's comment that competition "cannot be foreclosed with respect to one sector of the economy because certain private citizens or groups believe that such foreclosure might promote greater competition in a more important sector of the economy." *United States v. Topco Assocs., Inc.,* 405 U.S. 596, 610, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972). "If a decision is to be made to sacrifice competition in one portion of the economy for greater competition in another portion this too is a decision that must be made by

Congress and not by private forces or by the courts." *Id.* at 611, 92 S.Ct. 1126. *See also Sullivan v. Nat'l Football League,* 34 F.3d 1091, 1112 (1st Cir.1994) (suggesting that it is "improper to validate a practice that is decidedly in restraint of trade simply because the practice produces some unrelated benefits to competition in another market"). On the other hand, perhaps that language from *Topco* is not controlling because it is a dictum or incomplete or obsolete or because the case of such closely related markets as those for transport of natural gas and the natural gas itself might be distinguished.

In any event, we need not and do not reach this issue on the permissible bounds of rule of reason inquiry. For we conclude that the anticompetitive harms to the market for NOVA non interruptible transportation were so slight, and the procompetitive benefits of the assignments in that market were so obvious, that we must deem the assignments reasonable even without considering any procompetitive benefits to the separate but related market for natural gas.

**12.** Two other businesses, Stone Container and Great Falls Gas Company, also purchased NOVA non-interruptible transportation rights and could have competed with Paladin and MPC. NOVA also sold NOVA transportation

end sold the transportation rights for a lower price than it had hoped is evidence of a competitive market, not an anticompetitive one. Lower prices are almost always procompetitive.

Finally, Paladin has made no showing that MPC possessed "market power"—the power to control prices or exclude competition—in the market for NOVA non-interruptible transportation.[13] It therefore seems unlikely that MPC was capable of causing anticompetitive harm to the market. In sum, any anticompetitive effects of MPC's assignments were far outweighed by their procompetitive benefits.

In competition, there are winners and losers. Even viewing the evidence in the light most favorable to Paladin, we must conclude that MPC, because of its superior skill, foresight, and industry, made six sales that Paladin did not, and that MPC's doing so did not violate § 1 of the Sherman Act.

## III

 Paladin claims MPC's assignments of NOVA transportation constituted a conspiracy to achieve and maintain monopoly power in the distribution of natural gas to industrial customers on MPC's pipeline in violation of § 2 of the Sherman Act. To prove a conspiracy to monopolize in violation of § 2, Paladin must show four elements: (1) the existence of a combination or conspiracy to monopolize; (2) an overt act in furtherance of the conspiracy; (3) the specific intent to monopolize; and (4) causal antitrust injury. *United States*

v. *Yellow Cab Co.*, 332 U.S. 218, 224–225, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947). Here, even assuming that the first three elements can be satisfied, the claim must be rejected and the summary judgment affirmed because, again viewing the facts most favorably to Paladin, there is no showing of causal antitrust injury, the required fourth element.

 Injury that flows from aspects of a defendant's conduct that are beneficial or neutral to competition is not "antitrust injury." *MetroNet Servs. v. U.S. West*, 325 F.3d 1086 (9th Cir.2003); *Rebel Oil*, 51 F.3d at 1433. Where the defendant's conduct harms the plaintiff without adversely affecting competition generally, there is no antitrust injury. *MetroNet Servs*, 325 F.3d 1086; *Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1034–36 (9th Cir. 2001).

As we explained in our rule of reason analysis above, the procompetitive benefits of MPC's five-year transportation assignments outweighed any anticompetitive harm they might have caused. Paladin thus has not shown causal antitrust injury and cannot survive MPC's summary judgment motion.

## IV

Paladin next claims that MPC engaged in an illegal "tying arrangement." It claims that MPC agreed to provide excess gas to industrial customers on its pipeline during NOVA interruptions only on the condition that customers also purchase fu-

---

rights in competition with Paladin and MPC. Natural gas customers who purchased assignments of NOVA transportation rights also could have sold all or part of their transportation rights for a profit if MPC had attempted to raise prices above competitive levels.

**13.** Whether a monopoly could develop in this regulated market is doubtful, so long as NOVA will deal with others. There apparent-

ly are few barriers to entering the market for non-interruptible transportation. Paladin essentially was a broker. Paladin could be replaced by another broker, who presumably could enter the market without significant investments in equipment, real estate, personnel, and the like. Because of the ease of entry, there appears to have been little danger of long-term anticompetitive harm to this market.

ture five-year assignments of non-interruptible transportation service on the NOVA pipeline.

■ A tying arrangement is a device used by a competitor with market power in one market to extend its market power to an entirely distinct market. To accomplish this objective, the competitor agrees "to sell one product (the tying product) but only on the condition that the buyer also purchase a different product (the tied product), or at least agrees that he will not purchase the tied product from any other supplier." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992).[14]

■ A plaintiff must prove three elements to prevail on an illegal tying claim: (1) that there exist two distinct products or services in different markets whose sales are tied together; (2) that the seller possesses appreciable economic power in the tying product market sufficient to coerce

acceptance of the tied product; and (3) that the tying arrangement affects a "not insubstantial volume of commerce" in the tied product market. *See Kodak,* 504 U.S. at 461-62, 112 S.Ct. 2072; *Datagate, Inc. v. Hewlett–Packard Co.,* 60 F.3d 1421, 1423-26 (9th Cir.1995). Assuming for the sake of argument that Paladin has offered evidence of the first and third elements,[15] we still must reject Paladin's tying claim because Paladin has not presented evidence to satisfy the second element.

■ Essential to the second element of a tying claim is proof that the seller *coerced* a buyer to purchase the tied product. *Datagate,* 60 F.3d at 1426. A plaintiff must present evidence that the defendant went beyond persuasion and coerced or forced its customer to buy the tied product in order to obtain the tying product. *See id. See also Moore v. Jas. H. Matthews & Co.,* 550 F.2d 1207, 1212, 1216-17 (9th Cir.1977). Although it may

14. Justice White explained why tying arrangements are harmful to competition:

> There is general agreement ... that the fundamental restraint against which the tying proscription is meant to guard is the use of power over one product to attain power over another, or otherwise to distort freedom of trade and competition in the second product. This distortion injures the buyers of the second product, who because of their preference for the seller's brand of the first are artificially forced to make a less than optimal choice in the second. And even if the customer is indifferent among brands of the second product and therefore loses nothing by agreeing to use the seller's brand of the second in order to get his brand of the first, such tying agreements may work significant restraints on competition in the tied product. The tying seller may be working toward a monopoly position in the tied product and, even if he is not, the practice of tying forecloses other sellers of the tied product and makes it more difficult for new firms to enter that market. They must be prepared not only to match existing sellers of the tied product in price and quality, but to offset the attraction

of the tying product itself. Even if this is possible through simultaneous entry into production of the tying product, entry into both markets is significantly more expensive than simple entry into the tied market, and shifting buying habits in the tied product is considerably more cumbersome and less responsive to variations in competitive offers. In addition to these anticompetitive effects in the tied product, tying arrangement may be used to evade price control in the tying product through clandestine transfer of the profit to the tied product; they may be used as a counting device to effect price discrimination; and they may be used to force a full line of products on the customer so as to extract more easily from him a monopoly return on one unique product in the line.

*Fortner Enter., Inc. v. United States Steel Corp.,* 394 U.S. 495, 512-14, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969).

15. We assume, without deciding, that the five-year NOVA transportation assignments and the excess natural gas coverage are distinct "products." We express no opinion on that issue.

be difficult in some cases to find the dividing line between acceptable persuasion and illegal coercion, the Supreme Court's decisions and our past decisions provide guidance. The Supreme Court has found evidence of coercion when a plaintiff produced a written contract that required purchase of the tied product and when the plaintiff demonstrated that the defendant had leveraged its "substantial economic power" in the tying market to force buyers to accept the tie-in. *N. Pac. Ry. Co. v. United States,* 356 U.S. 1, 7, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). The Supreme Court has found evidence of coercion when a plaintiff introduced evidence the defendant possessed a patent or similar monopoly over a product—and therefore, market power—which it used to force customers to buy an undesirable product. *United States v. Loew's Inc.,* 371 U.S. 38, 45–47, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962). We have found evidence of coercion when a plaintiff produced a written contract that required the purchase of the tied product on extremely onerous terms. *Moore,* 550 F.2d at 1216–17 (finding evidence of coercion when a cemetery contract required buyers of cemetery lots to buy gravesite care service and monuments from the seller with up to 350% price mark-ups). We have found evidence of coercion when a plaintiff produced deposition testimony by a buyer that the defendant told him that the defendant would not provide the tying product (a product the buyer "could not afford to do without") unless the buyer also bought the tied product. *Datagate,* 60 F.3d at 1426.

■ On the other hand, the Supreme Court has not found evidence of coercion where the plaintiff failed to show that the defendant possessed market power in the tying product market and wielded that power to compel the purchase of another product. *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 26–29, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984). We have not

found evidence of coercion where a defendant used a package discount to encourage buyers to take both products. *Robert's Waikiki U–Drive, Inc. v. Budget Rent–A–Car Sys., Inc.,* 732 F.2d 1403, 1407 (9th Cir.1984) (finding no evidence of coercion when a rental car company offered customers discounted airfare if they agreed also to rent a car). *Accord Greenville Publ'g Co. v. Daily Reflector, Inc.,* 496 F.2d 391, 400 (4th Cir.1974) (holding that the economic pressure inherent in offering a package discount does not amount to coercion); *Marts v. Xerox, Inc.,* 77 F.3d 1109, 1113 (8th Cir.1996) (finding no coercion when the plaintiff failed to show that unbundled options offered by the defendant were "prohibitively expensive"). Our sister circuits have held that evidence of "mere sales pressure" does not constitute evidence of coercion. *See, e.g., Unijax, Inc. v. Champion Int'l, Inc.,* 683 F.2d 678, 685 (2d Cir.1982); *Ungar v. Dunkin' Donuts of Am., Inc.,* 531 F.2d 1211, 1224 (3d Cir.1976); *Bob Maxfield, Inc. v. Am. Motors Corp.,* 637 F.2d 1033, 1037 (5th Cir. 1981) ("An anti-trust violation occurs only if [the defendant] goes beyond persuasion and coerces or forces its customer to buy the tied product in order to obtain the tying product."); *Davis v. Marathon Oil Co.,* 528 F.2d 395, 402 (6th Cir.1975). These cases support a rule that mere and incidental sales pressure does not constitute coercion.

Paladin argues that three bits of evidence—statements by MPC, the NOVA assignments' five-year term, and the NOVA assignments' price—demonstrate that MPC forced its customers to buy NOVA transportation assignments.

■ First, Paladin points to two statements by MPC. On July 2, 1992, MPC notified Paladin by telephone that it might begin charging a natural gas customer, Ash Grove, a "balancing penalty" for its use of excess gas during NOVA interrup-

tions.[16] On the same day, MPC mailed customers a letter advertising its sale of NOVA assignments. The implication of these almost simultaneous communications, Paladin argues, is that MPC would charge the balancing penalty to industrial customers on the MPC pipeline unless they agreed to buy NOVA assignments from MPC.[17]

We disagree with Paladin that it is reasonable to infer coercion from these communications. The record shows only that MPC communicated *to Paladin* its intention to charge one customer the balancing penalty. Paladin points to no evidence that the alleged statement was communicated to industrial customers generally. For that reason, and because the penalty was a routine incident of contract, it cannot be concluded that the possibility of a balancing penalty coerced the industrial customers into buying NOVA transportation assignments. To the contrary, several of the customers' employees testified that MPC did not coerce them into buying NOVA transportation from MPC. They testified that they bought NOVA transportation from MPC for business reasons unrelated to any concern that MPC might charge them a balancing penalty.[18] Moreover, only six of the twelve industrial customers on the MPC pipeline bought NOVA transportation from MPC. That only half of MPC's customers bought MPC's assignments contradicts Paladin's contention that the July 2 statement implied coercion. Even Ash Grove, the customer Paladin

claims was most directly threatened by the July 2 communication, did not buy a NOVA assignment from MPC. Read in the light most favorable to Paladin, the challenged communications do not raise a genuine issue of material fact that MPC used coercion.

■ Paladin's second argument relates to the NOVA assignments' five-year contract term. MPC had sold customers *one-year* assignments in the past. Customers never would have agreed to *five-year* assignments, Paladin speculates, unless they were coerced. We disagree. To survive summary judgment, Paladin must present admissible evidence, not mere speculation, that MPC coerced its customers. That customers bought a new product (five-year assignments) when they previously had purchased a different product (one-year assignments), without more, raises no inference of coercion. If Paladin had offered evidence that a five-year assignment was so burdensome that customers would not have agreed to it absent forcing, that evidence would have suggested illegal coercion. *See Moore*, 550 F.2d at 1217 (stating that "coercion may be implied from a showing that an appreciable number of buyers have accepted burdensome terms"). But Paladin has offered no evidence that five-year assignments were at all burdensome or disfavored by the customers. All evidence is to the contrary. Customers testified they had a good business reason for preferring five-year contract terms: they perceived them to be a better value.[19]

**16.** It is undisputed that MPC was entitled to the balancing penalty under the relevant contracts.

**17.** Paladin's argument that these communications were coercive depends upon their simultaneity. But any implication of coercion would be weakened by the fact that customers did not *receive* MPC's letter on the date MPC allegedly threatened to charge Ash Grove the balancing penalty. MPC's letter was dated

July 2, 1992, so customers presumably did not receive it until later.

**18.** One customer testified that "[n]either MPC or any of its affiliates attempted, suggested[,] or in any manner interfered with our free election of whether to take the NOVA capacity offered for assignment by MPC or our choice of suppliers."

**19.** As an employee of customer Rhone–Poulenc explained, "Rhone–Poulenc's decision on

■ Paladin's third argument that MPC coerced customers into buying NOVA transportation relates to price. Paladin argues that it was selling NOVA transportation at a lower price than MPC in 1992, but that a few customers still bought NOVA transportation from MPC. Customers would not have done so unless they were coerced, Paladin says.

Again, we disagree that the evidence permits this speculative inference. Paladin was selling one-year assignments of NOVA transportation; MPC was selling five-year assignments. Even if customers paid MPC more per million cubic feet per day of service than they paid Paladin (a fact for which we can find no support in the record), it does not follow that customers were coerced, for they may have been concerned that Paladin's prices would rise in the future. More importantly, Paladin and MPC were selling different products, and customers testified that they considered the five-year assignments sold by MPC a better value than the one-year assignments sold by Paladin. The evidence does not support an inference that customers were coerced.

Read in the light most favorable to Paladin and considered together, the evidence raises no inference that MPC coerced customers into buying five-year assignments of NOVA transportation rights. *See Robert's Waikiki U–Drive*, 732 F.2d at 1407. The district court properly rejected Paladin's claim that MPC engaged in a per se illegal tying arrangement.[20]

## V

■ Paladin next alleges that MPC and its subsidiary NARCO are liable under the "essential facilities doctrine" because they are monopolists with control over a facility essential to gas marketers competing in the natural gas market downstream of the Grizzly Interconnect. That essential facility, Paladin claims, is MPC's pipeline from the Carway Interconnect to the Grizzly Interconnect, together with MPC's Dry Creek Storage Field. Paladin alleges that MPC and NARCO have used their control over the transportation and storage of gas on MPC's system to exclude Paladin from competing in the sale of natural gas to customers located downstream of the Grizzly Interconnect in states south of Montana.

■ To prove its monopoly claim under the essential facilities doctrine, Paladin must show, among other things,[21] that the defendant controls a facility that is "essential." *City of Anaheim v. S. Cal.*

its gas supplier in each year was based on our independent judgment as to reliable supply and best price. The decision to take the assignment contract from MPC for NOVA capacity was also based on our independent judgment, including the fact that by acquiring such rights we would be in a position to choose from a number of available suppliers and obtain the best price possible."

20. The district court rejected Paladin's tying claim because it determined that MPC did not "*sell*" imbalance coverage to its customers. *Paladin Assocs.*, 97 F.Supp.2d at 1028–29. The district court reasoned that tying occurs when a competitor agrees *to sell* one product on the condition that the buyer also purchase a different product. *Id.* Because MPC did not *sell* imbalance coverage to customers, but rather provided imbalance coverage to them free of charge, MPC could not have tied the

sale of NOVA non-interruptible transportation to the sale of imbalance coverage, the district court held. *Id.* at 1029.

In light of our holding that Paladin did not coerce sellers into buying NOVA transportation, we need not review the district court's holding that no illegal tying can occur when the alleged tying product or service is given *gratis* rather than sold. We express no opinion on that issue.

21. Under this doctrine, a plaintiff must show: (1) the defendant is a monopolist with control over a facility that is "essential"; (2) a competitor is unable practicably or reasonably to duplicate the facility; (3) a competitor is denied access to the facility by the defendant; (4) providing access to the facility was feasible; and (5) the plaintiff incurred antitrust injury as a result of the wrongful conduct.

*Edison Co.*, 955 F.2d 1373, 1380 (9th Cir. 1992). A facility is "essential" only if control of the facility carries with it the power to eliminate competition in a downstream market. *Alaska Airlines Inc. v. United Airlines, Inc.*, 948 F.2d 536, 544 (9th Cir. 1991).

The controlling issue for us is whether MPC's system, including the Dry Creek Storage Field, carries with it the power to eliminate competition in the sale of gas or gas transportation in the markets downstream of the Grizzly Interconnect.

Here, there is no evidence that competition in the downstream market on the CIG pipeline is dependent upon a supply of natural gas entering the CIG pipeline from MPC's system via the Grizzly Interconnect. To the contrary, it is undisputed that gas customers on the CIG system receive gas from sources other than MPC's system, and were receiving gas from other sources long before the Grizzly Interconnect was entered into service in 1991. Thus, even if MPC controls the Grizzly Interconnect, it does not have the power to eliminate competition in the downstream market.

▇▇▇▇▇▇ Paladin argues that MPC (or its subsidiary NARCO) *does* possess power to eliminate competition in a downstream market, specifically the "market ... for the shipment and sale of natural gas to ...

customers *at (or via) Grizzly.*" (emphasis added). We reject this unduly narrow "market" Paladin postulates because it is not a proper market for antitrust purposes. For antitrust purposes, a "market is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered." *Int'l Boxing Club of N.Y., Inc. v. United States*, 358 U.S. 242, 250, 79 S.Ct. 245, 3 L.Ed.2d 270 (1959). Paladin has offered no evidence that natural gas delivered to the CIG pipeline via Grizzly is part of a market separate from the natural gas delivered to the CIG pipeline elsewhere. It has offered no evidence that the natural gas delivered to the CIG pipeline via Grizzly is chemically or functionally different from the natural gas delivered to the pipeline elsewhere. It has offered no evidence that the price of natural gas delivered to the CIG pipeline via Grizzly is unrelated to the price of natural gas elsewhere. We conclude that natural gas delivered to the CIG pipeline via Grizzly is part of the same market as natural gas delivered to the CIG pipeline from other sources. And it is apparent that neither MPC nor its subsidiary NARCO possesses the power to eliminate competition in this larger downstream market. The district court properly rejected Paladin's essential facilities monopolization claim.[22]

---

*City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1380 (9th Cir.1992). Because we determine that MPC does not control a facility that is essential, we need not consider other issues raised by Paladin's claim, such as whether MPC is a monopolist.

22. Paladin also advanced an attempted monopolization claim based on its essential facilities theory. To prove its attempted monopolization claim under § 2 of the Sherman Act, Paladin must show: (1) a specific intent to monopolize a relevant market—i.e., an intent to control prices or destroy competition in a relevant market; (2) predatory or anticompet-

itive conduct designed to control prices or destroy competition; (3) a dangerous probability of success—i.e., a probability of achieving monopoly power in the relevant market; and (4) causal antitrust injury. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993). As we explained above, Paladin has offered no evidence that MPC or NARCO had the power to eliminate competition in the relevant downstream market. Neither MPC nor NARCO had a "dangerous probability" of achieving monopoly power in the relevant downstream market. We affirm the district court's judgment in favor of MPC on this claim.

## VI

Paladin is not the only plaintiff in this lawsuit. Paladin Associates (PA), a consulting business owned by Paladin's owner Marie G. Owens, also is a plaintiff. The district court granted summary judgment against PA on the ground that PA had not alleged that its consulting business sustained antitrust damages as a result of the defendants' alleged antitrust violations. Alternatively, the district court reasoned that PA did not in its response brief challenge the defendants' arguments that PA had failed to allege damages, and, applying its local rule, the district court held that PA's lack of response was an admission that the defendants' summary judgment motion was well taken.

On appeal, PA argues that it properly alleged antitrust damages in the district court. But PA's briefs do not address the district court's alternative holding that, under a Montana district court rule, PA effectively admitted that the defendants' summary judgment motion was well taken. By failing to make this argument in its opening brief, PA waived its objection to the district court's grant of summary judgment to MPC. *See Kim v. Kang*, 154 F.3d 996, 1000 (9th Cir.1998) (holding that we ordinarily will not consider matters on appeal that are not specifically and distinctly argued in an appellant's opening brief). We decline to disturb the district court's ruling.

## VII

Finally, we consider whether the district court abused its discretion in sanctioning Paladin for discovery violations. Paladin designated Robert Frantz and C.L. Webber as expert witnesses on October 15, 1997, almost six months after the deadline imposed by the district court. The district court sanctioned Paladin for this discovery violation under Federal Rule of Civil Procedure 37(c)(1) [23] by ordering Paladin to pay the costs and attorneys' fees associated with the defendants' depositions of these witnesses. Later, Paladin's expert witnesses submitted affidavits that contained new opinions not previously disclosed as required by Federal Rule of Civil Procedure 26(a)(2)(B). Ruling that this was a second discovery violation, the district court permitted the defendants to conduct supplemental depositions of Paladin's expert witnesses. The district court sanctioned Paladin for this second discovery violation under Rule 37(c)(1) by ordering Paladin to pay costs and attorneys fees associated with the supplemental depositions.

Paladin argues that the district court abused its discretion by not giving it an oral evidentiary hearing before imposing sanctions and by not disclosing the grounds for the sanctions. We disagree and hold that the district court did not abuse its discretion.

Paladin is correct that Rule 37(c)(1) permits a court to impose sanctions only "after affording an opportunity to be heard." However, conforming to the rule does not require an evidentiary hearing in every case. *Cf. Mathews v. Eldridge*, 424 U.S. 319, 334–335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (holding that courts should balance the costs and benefits of procedural safeguards to determine whether the Due Process Clause requires them). We hold that, under the facts and circumstances of the present case, the opportunity to submit briefs was an "opportunity to

---

**23.** Rule 37(c)(1) gives a court discretion to impose "appropriate sanctions" when a party violates discovery rules without substantial justification. Fed.R.Civ.P. 37(c)(1). Appropriate sanctions include "payment of reasonable expenses, including attorney's fees." *Id.*

be heard" within the meaning of Rule 37(c)(1). Here, Paladin received notice of the possibility of sanctions when MPC filed its motions for costs. It was afforded the opportunity to respond, and did indeed do so by filing a responsive brief. Given that the issues were such that an evidentiary hearing would not have aided its decision-making process, the district court did not abuse its discretion in proceeding without an evidentiary hearing after briefing. We note that our holding accords with the general view of our sister circuits. *See Angelico v. Lehigh Valley Hosp., Inc.,* 184 F.3d 268, 279 (3d Cir.1999); *Childs v. State Farm Mut. Auto. Ins. Co.,* 29 F.3d 1018, 1027 (5th Cir.1994); *Wilson–Simmons v. Lake County Sheriff's Dep't,* 207 F.3d 818, 822 (6th Cir.2000).

Second, Paladin argues that the district court did not disclose the grounds for its sanctions. *See Couveau v. Am. Airlines, Inc.,* 218 F.3d 1078, 1081 (9th Cir.2000) ("The imposition of sanctions requires a statement of reasons for the district court's action, including the need for the particular sanctions imposed."). Even assuming that a district court must disclose the grounds for any sanctions imposed under Rule 37, a question we did not specifically address in *Couveau,* Paladin has no basis for complaint in this case. The district court plainly stated its grounds for sanctioning Paladin. The district court explained in a written order that it was sanctioning Paladin for failing to designate expert witnesses in a timely manner. The district court later adopted a magistrate judge's report and recommendation that explained that Paladin should be sanctioned for failing properly to disclose its experts' opinions. These explanations provided Paladin with the procedural protection it was due.

The district court did not abuse its discretion by sanctioning Paladin for its discovery violations.

**AFFIRMED.**